**UNITED STATES SURGICAL CORPORATION, Plaintiff,**

v.

**HOSPITAL PRODUCTS INTERNATIONAL PTY. LTD., Surgeons Choice, Inc., and Alan R. Blackman, Defendants.**

**Civ. No. B–81–42 (TFGD).**

United States District Court, D. Connecticut.

Dec. 2, 1988.

Michael J. Dorney, Tyler Cooper & Alcorn, New Haven, Conn., John E. Nathan, Jesse J. Jenner, Robert J. Goldman, Alan M. Gordon and Richard A. Inz, Fish & Neave, Sanford M. Litvack, Dewey Ballantine, Bushby, Palmer & Wood, New York City, for plaintiff.

Alan R. Blackman, Boca Raton, Fla., pro se.

### AMENDED MEMORANDUM OF DECISION [*]

DALY, Chief Judge.

Plaintiff, United States Surgical Corporation ("USSC"), initiated this action on January 26, 1981 for patent infringement and related declaratory judgment relief. The complaint ultimately was amended to include claims for violation of § 43(a) of the Lanham Act, statutory and common law trademark infringement, and infringement of common law trade name rights. The plaintiffs initially sought injunctive relief, but that claim since has been rendered moot by the expiration of the patents-in-suit. The defendants generally denied the

gravaman of the complaint and asserted a variety of boiler plate defenses and affirmative defenses that challenge the validity and enforceability of the patents-in-suit. They also asserted several counterclaims to redress alleged unfair competition, and for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961. Pursuant to Fed.R.Civ.P. 42(b), the Court severed for trial the issues regarding infringement and the relevant defenses from the various other claims and counterclaims. The instant ruling, entered pursuant to Fed.R.Civ.P. 52(a),[1] represents the culmination of a lengthy and protracted trial and an arduous review of the entire record, particularly the proposed findings and conclusions submitted before and after trial, as well as the trial exhibits and transcripts of the trial testimony.[2]

## I. BACKGROUND

The subjects of the suit are four patents for surgical stapling devices and accessories all of which are owned by USSC and marketed under the trademark "AUTO SUTURE." The patents are as follows:

---

[*] The original memorandum of decision filed October 14, 1988 is hereby amended upon the unopposed motion of plaintiff to correct certain unintended errors in the original ruling resulting from the Court's *lapsus calumi*.

1. Also pending before the Court is the defendant's motion to dismiss, which the defendant Blackman made at the close of the plaintiff's case pursuant to Fed.R.Civ.P. 41(b). The Court reserved decision on that motion until the close of all evidence and the issuance of the instant ruling.

2. In addition to the instant action, the parties have been, or presently are involved in several other actions. These include an antitrust action brought by Hospital Products Limited ("HPL") against United States Surgical Corporation ("USSC") in New York, and an action for fraud brought by USSC against Hospital Products International Pty. Ltd. ("HPI") in Australia. USSC ultimately prevailed in the latter action and was appointed receiver for HPI. Because of proceedings in that action, the Court stayed the instant matter from October 7, 1983 until January 17, 1985. Before the trial of the instant matter resumed, however, the Court granted defense counsels' application to withdraw their appearance; a motion prompted, at least in part, by the purported inability of the defendants to pay their attorneys. The posture of

apparent indigency assumed by Blackman, coupled with USSC's role as receiver, was at least ironic. Because Blackman either did not, or was unable to retain counsel, he appeared *pro se* for the last three days of the forty day trial. Of those three days, two days consisted of the remainder of the plaintiff's case, and the last was consumed by Blackman's own case. The Court notes that, while representing himself, Blackman was articulate and poignant, and conducted examinations that were at times penetrating. Moreover, although Blackman's post trial proposed findings are not overly comprehensive, they are more than adequate, and are supplemented by the pre-trial findings and briefs that were submitted by able counsel while still appearing in the case.

Throughout the instant ruling the findings of the Court occasionally mirror the proposed findings submitted either by the plaintiff or by Blackman without specific reference thereto. In such instances the Court incorporates and implicitly adopts such proposed findings, but in keeping with its duties under Fed.R.Civ.P. 52(a), has done so only after an extensive review of the relevant trial testimony and exhibits. *See, e.g., Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1374–75 (Fed.Cir.1986) (cautioning district courts about blind adherence to, or verbatim adoption of proposed findings, especially those of the prevailing party).

| Patent No. | Title | Issue Date |
|---|---|---|
| 3,275,211 | Surgical Stapler With Replaceable Cartridge ("Hirsch '211") | September 27, 1966 |
| 3,315,863 | Medical Instrument ("O'Dea '863") | April 25, 1967 |
| 3,494,533 | Surgical Stapler For Stitching Body Organs ("Green '533") | February 10, 1970 |
| 3,499,591 | Instrument For Placing Lateral Gastro–Intestinal Anastomoses ("Green '591") | March 10, 1970 |

The plaintiff's patented products are the mainstay of a revolution in surgical suturing procedures and replace the traditional needle and thread for suturing and reconstructing human tissue. It is alleged that Blackman, a former USSC salesman in New York, began marketing and reproducing USSC's products under either the Hospital Products Limited or Surgeons Choice label.

The following issues were tried and shall be resolved by the instant decision:

1. whether the USSC patents-in-suit are valid and enforceable;

2. whether the manufacture, use or sale of one or more of the defendants' products infringe, contributorily infringe, or induce the infringement of one or more claims of the patents in suit; and,

3. whether the defendants' infringement, if any, was willful and deliberate.

### 1. *The Parties*

The plaintiff, USSC is a New York corporation having a principal place of business in Norwalk, Connecticut. The patents-in-suit issued to USSC–Maryland, with which USSC merged in 1975. As a result of the merger USSC acquired the patents, and thus, USSC has been, and continues to be, the owner of all right, title and interest to the patents, and has standing to sue, and recover, for any past infringement.

Defendant Hospital Products International Pty. Ltd. ("HPI"), and its successor-in-interest, Hospital Products Limited ("HPL"), are Australian corporations. For present purposes, the two shall be treated synonymously. The second corporate defendant, Surgeons Choice, Inc. ("SCI"), a wholly-owned subsidiary of HPL, is a Delaware corporation that, at the time the suit was instituted, maintained a regular and established place of business in Greenwich, Connecticut. In August, 1985, SCI filed for bankruptcy under Chapter 11 of the bankruptcy laws. The bankruptcy later was converted to a Chapter 7 proceeding, and on December 20, 1985, pursuant to the automatic stay provisions of 11 U.S.C. § 362(a), the Court ordered the instant action stayed only as to SCI.[3]

The individual defendant, Alan R. Blackman ("Blackman"), is a United States citizen who has been associated with SCI, HPI and HPL in a variety of capacities during the relevant period. The extent and nature of Blackman's associations with the corporate defendants is a matter of some dispute and shall be discussed more fully *infra*.[4]

### 2. *Historical Background of Surgical Stapling Devices*

Throughout medical annals it appears that surgeons typically have employed

**3.** Before the resumption of the trial following the stay the Court instituted pending the resolution of the action in Australia, HPI entered liquidation proceedings in Australia. The Court denied the defendant's motion to stay the instant action during those proceedings. *See supra* note 2.

**4.** It is not disputed that the Court has *in personam* jurisdiction over the parties. Nor do the parties contest subject matter jurisdiction under 28 U.S.C. § 1338(a), or venue under 28 U.S.C. § 1391(d) (providing that aliens may be sued in any district) and 28 U.S.C. § 1400(b).

manual suturing with needle and thread for the reparation and reconstruction during surgery of body tissue and organs. The several disadvantages attendant to the traditional suturing procedure include the usually excessive time while the patient is anaesthetized and his tissue is being repetitively handled, both of which may cause excessive trauma, bleeding, and infection that may impede the patient's recovery. Efforts to develop alternative, mechanical, suturing techniques and devices date back to at least as early as 1826. Not until the early portion of this century, however, did those efforts involve stapling devices such as those developed by Humer Hultl and Aladar von Petz of Hungary. Their stapling devices, like the other, similar devices developed by their contemporaries in other parts of Europe and the Orient, proved either too clumsy, tedious, or otherwise impractical for mass production and use in the surgical setting.

Prompted, at least in part, by the multitude of deaths from acute and profuse bleeding suffered by the Russian troops around Stalingrad in World War II, the Russians set out in 1946 to develop surgical staplers, particularly of the vascular genre, that would capture a simplicity of operation and time, and surpass the benefits of conventional manual suturing. The Russians organized their efforts by establishing in 1951 the Scientific Research Institute for Experimental Surgical Apparatus ("the Russian Institute"). The Russian Institute employed experts from several disciplines, including metallurgy, engineering, and the medical arts, and within several years had generated several patented inventions and designs for stapling devices.

A great many problems inherent in the Russian devices prevented any of them from ever being viable or marketable for widespread use. For example, each Russian instrument, as well as the metal staple magazines, were individually machined, which precluded the interchangeability of parts and mass production of the instruments. Further, the staples had to be loaded individually by hand; a tedious and time consuming process. Besides these difficulties, the devices also were difficult to main-

tain for precision operability. For example, the "C-clamp" staplers, typically used to seal off a diseased organ, utilized tiny pusher fingers attached to a pusher rod, that would press against the staples, causing them to eject from the cartridge and into the tissue. The pusher fingers were difficult to maintain and clean, and could easily bend out of alignment. In such an instance the stapler could jam during surgery or lose a staple from the staple line and cause leakage along the suture line. Similarly, the anastomosis devices, used to join two hollow body organs, also contained tiny staple pushers, that, because they were difficult to clean, would become inoperable from accumulations of fibrin. Although recognizing the need to develop devices with replaceable parts, such as anvils and magazines, the experts at the Russian Institute never were able to produce or market reliable, durable, and precision devices for mass production and widespread use.

In sum, while the Russian instruments, devised for a wide range of uses, had replaceable staple magazines that could be pre-loaded with fine wire staples, they left several problems to be overcome, such as staples that had to be hand loaded, instruments that had to be disassembled to be reloaded, the instruments accepted only a single type of magazine, and the delicate staple-driving fins were subject to damage, and the knives to dulling.

By 1958 the pioneering efforts of the Russian Institute had become known to prominent experts in the United States who had visited the Institute, and in 1959–60 the devices were brought to this country where they were demonstrated. Though well received, the shortfalls of the devices were recognized. At least one company licensed to market the Russian products in this country realized the need to develop pre-loaded disposable staple cartridges, but the idea never came to fruition. Despite great efforts, the Russian devices never were marketed with any success in this country.

The work of the Russian Institute did, however, prove to be the catalyst for research and development of similar devices

in the United States. One of the most notable of the relevant American pioneering devices was the vascular stapler, used to join two severed blood vessels, and patented by Rudolph F. Mallina. Mallina and his associates were intent on improving the Russian vascular stapler. They succeeded in patenting a device that enjoyed over its Russian counterpart an economy of parts, and disposable plastic bushing halves, and staple pushers. Nevertheless the device still required the timely process of manually loading the minute staples, and Mallina never resolved the puzzle of developing a device that could be used with a minimum of learning time and a maximum of reliability necessary to surpass the benefits of manual suturing. No more than one hundred of Mallina's vascular devices ever were sold, and their production was discontinued. Mallina also was responsible for developing other devices such as a single stapler with a permanent pusher, and a "five-in-line" stapler, neither of which embodied a unitary stapling device with a disposable pusher, nor were any of the devices marketed successfully.

Another American patentee, Dr. Harry Fleischer, devised a surgical stapler of the "C-clamp" variety, but the instrument proved to be too clumsy and none but the prototype ever was produced. Nevertheless, Blackman bought the rights to the invention sometime after the commencement of the instant action.

### 3.  *Technical Background and Description of the Patents-in-Suit*

The USSC patents-in-suit include patent claims that describe and cover two types of sterile, pre-loaded disposable loading units ("DLU's") designed for use with two basic types of USSC's patented surgical stapling instruments. The first type of instrument is for linear closure of internal body tissue. Typically used to seal off an organ so that adjacent, diseased tissue may be removed, the instrument simultaneously places two parallel, staggered rows of staples into the tissue. The tissue to be engaged is placed in the end of the instrument, which is shaped like a "C." Thus, instruments of this type commonly are called "C-clamp"

instruments. Besides AUTO SUTURE™ the USSC C-clamps are marketed under the trademarks "TA 30," "TA 55," and "TA 90."

The DLUs for the TA 30 and TA 55 consist of a disposable anvil, alignment pin, and cartridge (as opposed to a permanent, reusable magazine) assembly. The cartridge is loaded with staples and is fitted in the rear with "pushers," which eject the staples. The TA 90 DLU is identical to the TA 30 and TA 55 except for the alignment pin, which is included as a permanent and reusable component of the TA 90 instrument. All of the components of the TA DLUs are disposable and are designed for only a single use.

The second type of instrument typically is used for lateral anastomosis: the joining of two hollow body organs, such as the stomach and intestines, after surgery. The instrument, marketed by USSC under the additional trademark "GIA" (gastro-intestinal anastomosis), places two double staggered rows of stainless steel staples, and has the additional capability of dividing, or cutting, the tissue between the two double staple rows. The DLUs for the GIA include a disposable cartridge that contains the staples and pushers, an anvil, and a disposable push-bar/knife assembly, which is used to eject the staples sequentially from the cartridge and to cut the tissue.

In order to function in the precise fashion for which they were engineered, after being injected into the targeted tissue, the staple must form a general "B" shape. Deviations from the designated shape are not acceptable, and render the device useless. For example, a staple that is too tight may crush the tissue, prevent the flow of nutrients and result in necrosis, while a staple that is too loose may allow the joined tissue to separate and prevent healing. The apparent ability consistently to fire staples and form the B-shape are just one of the key advantages that USSC claims its patents have over similar other devices that have not attained the same commercial or practical success. For example, the USSC stapling instruments and accessories can be mass produced, are easi-

ly handled, are preloaded, and their parts are interchangeable.

### a. Hirsch '211

The Hirsch '211, the application for which was filed on May 10, 1965, was the first patent obtained by USSC that was the product of its own research and development. Generally, the patent embodies two features that are claimed to be an improved staple cartridge for a surgical stapling instrument. More specifically, USSC has asserted claim 4 of the patent as a representative claim against the defendants. That claim reads as follows:

> A staple cartridge, comprising an elongated body portion of generally rectangular cross section; said body portion including a plurality of aligned slots penetrating the body portion with each slot adapted to receive and retain a staple; a pair of rails oppositely disposed along the body portion and extending the length thereof in spaced apart relation; a planar plate comprising the face of the body portion in spaced apart relation with the rails, and extending the length thereof, and protruding beyond the lateral dimension of the body portion to form grooves between it and each of the rails, said body portion and face being apertured to receive pin means adapted to penetrate the cartridge.

Thus, the staple cartridge is a replaceable one that is mounted by sliding it vertically onto parallel rails that guide it into position on the instrument frame. It is designed so that the cartridge can slip into place on the instrument frame, and can be replaced without having to disassemble the instrument. Furthermore, the tolerances of the cartridge are such that each cartridge can be replaced and positioned within the same degree of precision.

The second element of claim 4 that is in issue is the alignment pin, which serves the dual function of maintaining the alignment of the cartridge while retaining the tissue that is the target of the staples. The pin is inserted through both the instrument frame and the cartridge, and continues until it closes the open space in the C-frame in which the targeted tissue is confined. So positioned, the pin, which may have one or more prongs, aligns the cartridge with both the anvil and the instrument frame, while retaining the tissue in the C-frame. Although not specified in the language of claim 4, it is clear from the specifications that the patent teaches that the pin is aligned in the same general direction as the staple slots.

USSC's TA 30, TA 55, and TA 90 DLUs embody all elements of claim 4.

### b. The O'Dea '863

The O'Dea '863, which is applicable to both the C-clamp and lateral anastomosis instruments, claims a unitary cartridge assembly with internal pusher elements to eject the staples. The staples are pre-sterilized, and loaded and positioned in the cartridge before leaving the factory. USSC has asserted claims 1 and 15 of the O'Dea '863 as representative claims against the defendants:

> 1. A disposable unitary staple cartridge assembly, especially for use in a surgical stapling device, comprising: a cartridge member, a plurality of slots extending through said member adapted to hold a staple therein having a back end located intermediate the ends of the slot, a staple drive member including a plurality of finger elements, said drive member being aligned relative to said cartridge member by means of said fingers extending to a substantial extent into respective ones of said slots and into abutting relation with the back end of each staple, mounting means on said cartridge member for mounting said assembly as a unit on a stapling device.

> \*    \*    \*    \*    \*    \*

> 15. A medical stitching instrument comprising a cartridge assembly support, a removable unitary cartridge assembly comprising a plastic cartridge removably mounted on said support and having a face adapted to engage an organ and the like, a plurality of slots arranged in said cartridge and communicating with said face, each said slot being adapted to hold a surgical staple therein, a pusher positionable in each said slot behind the staple therein prior to the assembly of said

cartridge on said support, said instrument further comprising an anvil relatively movable with respect to said face and cooperating therewith to clamp the organ, said anvil having means thereon aligned with each said slot for contacting said staple after the latter has been ejected from said slot and means for moving said pusher in said slots to eject said staples.

Claim 1 is embodied in USSC's TA 30, TA 55, and TA 90 DLUs, and claim 15 is embodied in the USSC GIA DLU and GIA instrument.

### c. The Green '533

The Green '533 claims a number of improvements to surgical stapling instruments, particularly an anvil groove. The slope of the walls of the groove vary so that it is flared at the top to engage and align an errant staple, and more sharply sloping at the bottom of the groove so that the staple may be controlled and pressed into the B-shape. The anvil groove is designed to prevent misalignment of staples, and to promote the consistency with which B-shape staples may be fired. Moreover, by countervailing residual misalignment problems, the anvil groove contributes to the interchangeability of parts and the ability to mass produce precision parts. The relevant claim of the '533 is 22 which reads as follows: [5]

A surgical stapler comprising frame means including a first member to receive a cartridge loaded with surgical staples and a second member to receive an anvil, a cartridge loaded with surgical staples detachably mounted on said first member, an anvil detachably mounted on said second member, said anvil having a working surface from which a plurality of staple shaping grooves extend into the body of said anvil, at least the portion of the edges of said grooves adjacent their ends being flared into said surface to provide a lead-in for staples and thereby to assure proper alignment with the central axes of said grooves during bending

up of said staples notwithstanding minor misalignments of said staples when first contacting the working surface of said anvil, the flared portion of said grooves extending into said surface an amount less than the depth of said grooves so that the bending up of said staples is controlled by the bottom unflared portion of said grooves, and means to bring said cartridge and anvil into a proper working relation and to drive the staples from said cartridge against said anvil to bend up same.

Claim 22 is practiced in USSC's TA 30, TA 55, TA 90 and GIA DLUs in combination with the corresponding USSC TA or GIA instrument.

### d. The Green '591

The '591 describes and claims a cartridge and an instrument/cartridge combination for the GIA series from which a staple pusher ejects two staples simultaneously. At issue are claims 9 and 15. Claim 9 is dependent on claims 1 and 2 and incorporates all the elements of those claims:

1. A cartridge assembly for a surgical stapler having an elongated cartridge with a tissue engaging surface, two sets of staple-carrying grooves each adapted to carry a staple with its free ends projecting toward said surface, each set being aligned in the longitudinal direction, said sets being separated by a guide path for guiding an ejection effecting cam member, each set of staple-carrying grooves being open to said path and extending to said surface, and an integral drive member positioned on the opposite side of the staples from said surface having two drive sections guided by the cartridge to ride within the planes of the staple-carrying grooves in opposite ones of said sets and having means disposed in said path to be engaged by the cam member to effect movement of the drive member toward said surface and thereby to effect a simultaneous ejection of the two staples.

---

**5.** Because of a printing error in the '533 patent application, the language of claim 22, as printed herein, is the product of a stipulation between the parties and represents the correct language of the claim.

2. A cartridge assembly as set forth in claim 1 wherein said sets are longitudinally staggered and said last-mentioned means includes a cam symmetrically positioned in the longitudinal direction relative to the two drive sections so that forces opposing staple ejection are balanced about said cam.

\* \* \* \* \* \*

9. A cartridge assembly as set forth in claim 2 wherein a plurality of such sets are provided divided by the path and longitudinally aligned to form a pair of parallel and aligned rows of sets, the sets of one row being staggered and overlapping in the longitudinal direction the sets of the other, and a plurality of such drive members carried by cooperating sets, the front and back edges of each drive member being spaced from adjacent drive members so as not to interfere with the adjacent drive members.

\* \* \* \* \* \*

15. A surgical stapling instrument comprising an upper frame having a midregion, a finger-like cartridge-carrying projection extending forward of the midregion and an elongated handle portion extending rearward of the midregion, an elongated cartridge secured to said cartridge-carrying projection and having a pair of longitudinally extending transversely spaced parallel pusher guide bar paths opening through the back of the cartridge and a longitudinal knife member guide path intermediate of and parallel with said pusher bar guide paths and also opening through the rear of the cartridge, at least one row of staple-carrying grooves disposed along each of said guide paths, each pair of grooves extending generally perpendicular to the direction of the pusher bar guide paths, said cartridge further carrying a plurality of staple drive members each associated with at least one pair of staple-carrying grooves and being guided by the cartridge to drive the associated staple along said staple-carrying grooves, each member having a cam portion extending into the associated pusher bar path, a pusher assembly including a pair of elongate pusher bars and an elongate knife member disposed between said pusher bars, each said pusher bars having a cam surface at the forward tip thereof for cooperative engagement with said cam portion of said drive members, operating handle means securing the rear ends of said elongate pusher bars and knife member, the forward parts of said pusher bars and knife member penetrating the respective paths in said cartridge, said handle portion and operating handle means including guide means for guiding the operating handle generally parallel to said paths during ejection, the longitudinal relationships of each corresponding pairs of staple-carrying grooves being related to the longitudinal relationships of the pusher bar cam surfaces such that the peak staple ejection resistive forces encountered by the one pusher bar occur before or after but not during the time such forces are encountered by the other pusher bar.

Thus, the claims in issue describe a DLU and instrument in which a staple pusher ejects two staples simultaneously. The patent discloses a double staple pusher positioned such that each staple pusher bridges across the pusher bar path so that half of the pusher is on either side of the pusher bar path. Each pusher is positioned under two staples, one from each row on either side of the pusher bar path, so that each pusher will eject two staples. Each staple pair is staggered longitudinally (i.e., each staple is positioned diagonally behind the other, in a zig-zag fashion) and bridges the push-bar path. In this way, when a double pusher ejects two staples to engage tissue, the forces generated tend to be balanced in both the side-to-side and front-to-back directions, thereby decreasing the offset loadings on the pushers and reducing their tendency to bind. The tips of the pusher bars are arranged, relative to the pushers, so that the maximum force that must be exerted to force the staples into the B-shape occurs at only one pair of staples at a time. The anvil and pusher bar/knife assembly also are designed for improved alignment and ease of operation.

Claim 9 is embodied in USSC's GIA DLUs and the combination of a USSC GIA DLU and a USSC GIA instrument embodies the subject matter of claim 15.

### 4. The Prior Art [6]

On several occasions prior to trial, the defendants identified nearly one hundred patents as prior art. The list of those patents was not limited to surgical staplers and related devices, but included patents for wall sockets, wood screws and funnels, as well as common paper staplers, to name only a few. In contrast, it appears that the United States Patent Office held a different, more limited view of the scope of the relevant prior art. Granville Y. Custer, Jr. was the Examiner for the Hirsch '211, O'Dea '863, and Green '591 patents, and conducted the search of prior art for the Green '533 application. Mr. Custer also was the Examiner responsible for the prosecution of several of the patents that have been identified as prior art relevant to the patents in suit—such as the Strekopytov '643 and the Kapitnov '581—and which were relied upon by the defendants at trial. During the course of the prosecution of the patents in suit, fourteen prior art references were cited by the Examiner, ten of which were relied upon by the defendants at trial. The defendant cites in the post-trial brief only a small fraction of the prior art references relied upon previously, thus limiting in scope the present discussion.[7] More specifically, the defendant has urged the Court to review only the following prior art references for each of the defenses raised:

PATENT
Hirsch '211
| | |
|---|---|
| Anticipation: | Strekopytov '643 |
| Fraud: | Strekkopytov '643; Strekopitov '564; Gorkine '035 |

O'Dea '863
| | |
|---|---|
| Anticipation: | American Vascular Stapler; 1962 Scientific American; Hirsch '211 |
| Fraud: | Mallina '654; Unspecified Russian instruments; Hirsch '211 |

Green '533
| | |
|---|---|
| Anticipation: | McGill '316; Rudolphsen '608; household funnel; Cavanagh '331 |
| Obviousness: | same as above; Hultl; Friedrich |
| Fraud: | O'Dea '863; Sampson '637; Ulrich '527 |

Green '591
| | |
|---|---|
| Anticipation: | King '675 |
| Obviousness: | King '675; Bobrov '606; Fisher '300; Hultl |

### *Humer Hultl*

Humer Hultl, a renowned Hungarian surgeon, first presented a surgical stapling instrument in 1908. Variously described as weighing between seven and eleven pounds, the instrument was comprised of several moving parts, and was loaded manually. It was capable of placing four rows of staples that were of round cross-section steel wire, which is similar to the type employed in modern devices. The staples were ejected sequentially by the manipulation of a crank reminiscent of an old fashioned coffee grinder, and upon striking an anvil, the staples were formed into a general B-shape. Once the staples were placed, the tissue could be divided, leaving two rows of staples on either side.

Hultl used his procedure primarily to prevent leakage of organs temporarily during surgery. Although acclaimed as a brilliant first attempt to develop a surgical stapler, it has been criticized for its clumsiness, its tendency to crush tissue, and the extensive time consumed in loading. Only fifty or so of the instruments ever were produced, none of which appear to be in use today. The most important contribution to the prior art by Hultl is the example it set for later developments such as the

---

**6.** The findings herein relate not only to the obviousness claims under 35 U.S.C. § 103 that the defendant has raised post-trial with regard to the Green patents, but also are relevant, and intended to be applicable to the other claims such as fraud and anticipation that the defendant has raised against all the patents-in-suit.

**7.** The defendant has the burden of rebutting the statutory presumption of validity enjoyed by the plaintiff's patents in suit. 35 U.S.C. § 282. In-

sofar as any claim or defense urged by the defendant is founded upon a particular prior art reference to which sufficient reference is not made in the post-trial brief, such claim or defense is deemed abandoned. The Court acknowledges that the reduction of prior art references from those cited prior to trial, partially is the result of a reduction in the number of claims asserted by the plaintiff.

von Petz instrument, and at least one of the Russian instruments.

Although not asserted by the defendants as pertinent prior art, the von Petz instrument was an important contribution that arrived in the nineteen twenties. The construction was less complex than the Hultl device, and utilized square, instead of round, wire for the staples. The von Petz instrument presented an advancement in the consistency, reliability and quality of the staple formation, but there also were several drawbacks. For example, the use of square wiring resulted in larger, gross and less desirable staples, but which required less effort and guidance to form an appropriate staple.

### Bobrov '606

Bobrov United States patent 3,709,606 (" '606") is a Russian lateral anastomosis instrument cited during the prosecutions of the O'Dea '863 and the Green '591, and mentioned in the '591 application. The patent discloses a permanent anvil and pushers, and two rows of staples divided by a knife/pusher bar path. The single pusher bar ejects two staples simultaneously, one on either side of the knife/pusher bar path, and each pusher ejects a single staple. The '606 was known to encounter problems in advancing the knife/pusher bar, especially when the pusher slots became filled with blood and fibrin. The '606 was not found by the Patent and Trademark Office to be of sufficient pertinence to render the '591 or '863 unpatentable.

### Fisher '300

The Fischer United States patent 960,300 (" '300") discloses a star wheel structure that forces the ejection of the staples. The two rows of staples are staggered relative to one another, and two star wheels are attached to the front of a rack, which is advanced along the two rows of staples.

### Mallina '458

One of the many patents obtained by Rudolph Mallina was 3,286,458 (" '458"), which disclosed different machines for loading staples into half-bushings and linear arrays. Only preliminary prototypes ever were built. Although Mallina may have to his credit other patents and designs that are relevant prior art, the Court is not persuaded that the '458 is relevant to any of the claims in issue.

### Strekopytov '643

The Strekopytov 3,252,643 (" '643") shows a Russian type of C-clamp instrument that has been called the UTL–70,[8] and which has been conceded by the plaintiff to be prior art. In fact, it was cited, but not discussed by the Patent Examiner in the course of the prosecution of the Green '591.

The UTL–70 employs a replaceable magazine that has two rows of staples separated by a third row. After the two rows of staples are fired into the tissue, the tissue is manipulated before the third row is fired. In this sense the UTL–70 is comparable to using two instruments side-by-side. The reusable magazine is mounted by four lugs, or "ears," that fit onto four L-shaped slots on the instrument frame. The magazine is located on the instrument by positioning the lugs into the L-shaped slots. In this regard the '643 is similar to the Strekopitov 3,080,564 (" '564") which also is claimed by the defendants as prior art. To remove and reload the magazine, the instrument must be partially disassembled.

Other features include delicate pushers that permanently are attached to the push rods in the instrument, and four pins that each have two tines. The patent discloses that these pins are for the purpose of retaining tissue. Even though the drawings for the '643 display the pin holes to be located at ninety degree angles to the direction of the instrument frame, the UTL–70 has pin holes that extend through the magazine. In either case the pin holes are larger than the pin so that the pin does not contact the magazine, rather the holes provide clearance for the easy passage of the pins.

The '643 does not appear to be in use today, and is difficult to obtain, the Court's exhibit having been borrowed from the Smithsonian Institution.

---

**8.** The numbers following the C-clamp devices relate to the size of the instrument. For example, the 70 following the UTL designation indicates that the C-clamp is 70 millimeters high.

### Strekopitov '564

The '564, cited by the plaintiff during the prosecution of the Hirsch '211, O'Dea '863, and Green '533 patents, describes the Russian UKB C-clamp instrument. Like the '643, the '564 discloses a reusable magazine that has four lugs which are inserted into four L-shaped slots on the instrument frame. To reload a spent magazine, the instrument had to be disassembled by rotating a knob that moved the pusher bar and other components backward, and in so doing, disengaged other lugs from ears on other portions of the instrument frame. The body then was lowered away from the bar so that the lugs of the spent magazine could be moved out of the slots that maintained their location. This reportedly was a time consuming procedure.

Like the '643, the '564 design also includes pushers attached to a push rod in the instrument. Unlike the '643, however, the design does not include a pin of any kind, possibly because the UKB was used on tough tissue that easily was retained without a pin.

The Patent Examiner did not reject any of plaintiff's claims on the basis of the '564.

### Gorkine '035

The Gorkine 1,237,035 ("'035") is a French patent, of which Strekopitov was a co-patentee, and describes the Russian UKL C-clamp instrument. Although very similar to the '564, including the way in which it is disassembled to replace the magazine, the UKL is distinguished by its pin feature. The pin is forked with two tines that are inserted into holes in the rear leg of the C-clamp. The pin appears to serve the sole purpose of tissue retention, as it does not at all contact the magazine.

### Kapitanov '581

Kapitanov 3,314,581 ("'581") is a United States patent for a multi-staple instrument for placing a longitudinal vascular suture. The patent discloses scissor-like instruments for the placing of a single row of staples. The staples are contained in a reusable magazine that is secured in the instrument by lugs, and are ejected by pushers permanently attached to the instrument.

### Mallina '654

Mallina's 3,144,654 ("'654") patent describes a vascular stapling instrument for joining severed blood vessels end-to-end. The relevant feature of the patent involves the disposable bushing—as opposed to a cartridge—assembly. A complete bushing assembly has several components that must be assembled manually on the suturing instrument. These include two staple bushing halves, two anvil bushing halves, and a nondisposable pusher that is inserted into each bushing half. Each staple and anvil component is semi-cylindrical in shape and eventually mates on the instrument to form a staple cylindrical half and an anvil cylindrical half. The ends of the vessel to be joined by suture are clamped between the two staple bushing halves and the two anvil bushing halves.

The '654 represented an improvement over its Russian predecessor, at least insofar as the '654 added a gearshift to engage the bushing half with the anvil half during surgery and reduced the number of parts from twenty-one to fifteen, and made them easier to fit together. Mallina also introduced ridges within the bushing halves to gently clamp and hold the vessel ends, and developed plastic disposable bushing halves as opposed to the Russian reusable metal bushing halves that had to be loaded manually.

### American Vascular Stapler

Mallina and his associates eventually developed five prototypes of a vascular stapling device, the last of which commonly is known commercially as the American Vascular Stapler. In addition to the advances of its predecessors, the commercial device also employed disposable pushers in the bushing halves.[9] Like the '654 though, the commercial stapler embodied multi-component bushings that were assembled on separate portions of the instrument before sta-

**9.** The '654 patent application was filed three years before the American Vascular Stapler was marketed.

pling, and disassembled separate from the instrument after firing. It was the procedures required for removing and replacing the bushings that prompted Mallina to concede that the device could not achieve the necessary advantage over manual suturing of limited learning time and maximum reliability.

No more than one hundred of the devices ever were marketed by Codman & Shurtleff, a manufacturer of surgical instruments that supported the work of Mallina and his associates. Even though none are in clinical use today, and have not been produced since 1967, the plaintiff concedes it is prior art.

*Scientific American Article*

In the October, 1962 edition of the *Scientific American* magazine, (vol 207, no. 4), an article by Mallina appeared in which he described his work, particularly the '654, and its advances over its Russian counterpart. The article depicts the Russian UKB and vascular instruments, as well as the von Petz instrument. The article is not as specific as some of the applications for the patents described in the article. For instance, only passing reference is made of the role of the pusher in the vascular stapler without mentioning how it is assembled or whether it is disposable. In fact the drawing of Mallina's device in the article is one on which the pushers typically are constructed of Vitallium—a substance too expensive to be used for a disposable component.

*Ulrich '527*

Ulrich designed surgical staplers for over twenty-five years, and was responsible for the first replaceable magazines. Several of his patents were raised at trial, but only the 869,527 German patent (" '527") has been asserted at this juncture with regard to fraudulent procurement of the Green '533. Findings with regard to Ulrich's earlier patents are provided as background.

Ulrich's German patent 569,169 embodied a stapler without a magazine that fired two rows of three staples. The second embodiment of the '169 was a single stapler. Both embodiments included a permanent magazine that was not replaceable.

Ulrich's German patent 618,922 disclosed an improvement over the '169, and embodied a single stapler with a magazine separated from the stapling site, and a C-clamp instrument with a replaceable magazine. The magazine, or "frame" in the latter embodiment could be inserted from above or below the instrument and was aligned by the entry into the magazine of the permanent pusher fingers.

In cooperation with Drs. Friedrich and Neuffer, Ulrich designed what has been called the Friedrich instrument, which is a C-clamp instrument with metal magazines. Like the Russian C-clamps, the Friedrich had permanent pushers that easily were bent and difficult to maintain. The magazine of the instrument is shaped like a tuning fork; each prong capable of laying a row of staples. Each magazine was designed to mate with a particular instrument and was positioned by sliding it along a set of tracks on the instrument.

There are two features on the instrument of particular note. The first is the ability of the instrument to fire less than a complete row of staples. This is accomplished by manipulating the magazine so that only a portion of the magazine is positioned on the instrument. The length of the portion positioned on the instrument corresponds to the length of the staple line. The second noteworthy feature is a detent that has a pin designed to fit into any of a series of small depressions on the side of the magazine. The putative purpose was to pre-position the magazine, with final alignment to be provided by the insertion of the pusher fingers into the staple slots. Although the detent on the exhibit that was borrowed from the Smithsonian did not function properly, it appeared that the design would not permit pre-positioning of any significant firmness.

The only Ulrich patent that the defendant has cited, however, is the '527, which came nearly twenty years after the Friedrich instrument. It too embodies the C-clamp and utilizes the same type of magazine as the Friedrich instrument, including

the pre-positioning detent. An additional disclosure of the patent is a reinforcing hook and a threaded screw, neither of which pass through or contact the magazine.

*Sampson '637*

The Sampson patent 3,017,637 ("'637") discloses a surgical stapling instrument comprised of two straight bars connected at one end by a hinge and at the other end by a latch. It discloses neither a cartridge nor a removable anvil. The two straight portions, one of which contains two rows of staples, are positioned around the targeted tissue, such as the stomach, and then closed and clamped at one end by the latch.

*Cavanagh '331*

The Cavanagh 2,167,331 ("'331") was cited to the Patent Examiner during the prosecution of the Green '533 patent, and has been cited by the defendant to support a defense of non-infringement. The patent discloses a typical paper stapler in which the sides of the anvil groove taper downward and inward all the way to the base of the groove. The Examiner determined that the '331 was not sufficiently pertinent to render the '533 unpatentable.

*Greenfield '583*

The Greenfield patent 1,287,583 ("'583") issued in 1918, discloses a paper stapler in which a shallow anvil groove is flared all the way to the bottom. Like the Cavanagh '331, the '583 was cited during the prosecution of the Green '533, but found not to be sufficiently pertinent to render the '533 unpatentable.

*King '675*

The King and Green patent 3,490,675 ("'675") discloses a precursor to the plaintiff's GIA lateral anastomosis instrument. As described by the plaintiff, the cartridge includes two pairs of rows of staples, each row is longitudinally staggered and the pairs lie on either side of a central knife path. A pusher bar travels between each pair of rows of staples and, for each staple in sequence, contacts a cam surface offset from the side of a pusher so that there is a single pusher for each staple. As the pusher bar travels between each pair of rows of staples, contact between the pusher bar and pushers causes the staples to be ejected and formed against the anvil. The device proved to have problems, and, as a result, was not commercially successful. For example, because the driving force on the cam surface is offset, "turning moments," are created that tend to turn the pusher about all three of its rectangular axes. These turning moments may increase the risk that the pushers will bind against the side walls or staple groove walls and jam. Furthermore, the arrangement of the pushers and pusher bars was such that peak ejection forces were experienced simultaneously by the two pusher bars.

*McGill '316*

The McGill patent 212,316 ("'316") dates to 1879 and discloses a paper stapler capable of having loaded and ejected one staple at a time. It also discloses an anvil with a variety of grooves for different staple forms, and an adjustable position relative to the arm or staple driver.

*Rudolphsen '608*

The Rudolphsen patent 2,294,608 ("'608") discloses an electrical connector that is inserted into a wall socket that has chamfered edges. The plaintiff stipulated that this patent is prior art.

## II. VALIDITY

The patents-in-suit and the disputed claims enjoy a statutory presumption of validity, and the one attacking validity has the burden of proving invalidity by clear and convincing evidence. 35 U.S.C. § 282;[10] *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir.1986), *cert. denied*, 480 U.S. 947, 107

---

10. The relevant portion of 35 U.S.C. § 282 provides:

   A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

S.Ct. 1606, 94 L.Ed.2d 792 (1987); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.1983). The burden is static and remains with the challenger throughout the trial. *E.g., American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Behind the presumption is the basic proposition that the Patent and Trademark Office (PTO) has some expertise in determining whether the conditions of patentability have been met, and their determinations are entitled to some deference. *Id.* at 1359; *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1560 (Fed.Cir.), *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986); *see Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve*, 796 F.2d 443, 447 (Fed.Cir.1986), *cert. denied*, — U.S. ——, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). Thus, the burden upon the party attacking validity may be more difficult when the prior art relied upon at trial is the same as that before the PTO, *Barnes–Hind/Hydrocurve*, 796 F.2d at 447, while the meeting of the burden may be facilitated by the introduction of prior art not before the PTO. *Hybritech, Inc.*, 802 F.2d at 1375.

### 1. *Anticipation*

■■■■ An invention is not novel, and thus not patentable, if before the invention by the patent applicant, the invention was "known or used by others in this country, or patented or described in a printed publication in this or a foreign country." 35 U.S.C. § 102(a). Such knowledge, usage, patents, and descriptions generally comprise the prior art. Should the prior art disclose an invention within the meaning of § 102, it is said to "anticipate" the invention, and the invention shall fail to fulfill the novelty requirement. The anticipation defense is a narrow one that "requires the disclosure in a single prior art reference of each element of the claim under consideration." *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1554 (Fed.Cir. 1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Thus, the defendant must demonstrate "identity of invention," which ultimately is a question of fact. *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). When evaluating the merits of the defense, the Court must construe the patent claims in light of the patent specification and prosecution history, and if possible, the claims should be construed so as to sustain their validity. *ACS Hosp. Systems, Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed.Cir.1984); *see, e.g., United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966) (claims should be construed in light of the specifications with a view to ascertaining the invention).

### a. Hirsch '211

It is the defendant's contention that claim 4 of the '211 is anticipated by the Strekopytov '643 (the UTL–70). Although the Court has had the benefit only of hearing the testimony of the plaintiff's witnesses, particularly USSC's expert, Mr. Noiles,[11] it is clear from a review of all the evidence that claim 4 differs in at least two significant respects from the reference asserted by the defendant.

First, the defendant has attempted to draw an analogy between the lugs disclosed in the '643 and the rails of the '211. The lugs of the '643 might be called "rails," but they were neither intended nor constructed as such as that term is used in claim 4. Rather, the lugs were designed to snap into, and be received by the L-shaped slots. These slots bear no relation to the

---

11. The Court is sympathetic with Blackman's plight in having to proceed *pro se* during his defense case, and with his proclaimed inability to afford expert witnesses, particularly Dr. Freundenstein. Yet, such circumstances do not alleviate the defendant of the substantial burden of proving the patents invalid or unenforceable. Although the defendants were not able to assail Noiles's credibility through the presentation of other witnesses, the defendants did enjoy the good fortune of having very able counsel conduct one of the better cross-examinations ever witnessed by the Court. Thus, in addition to Blackman's objections to Noiles's testimony, which are found in his post-trial brief, the Court has been left to evaluate the credibility of Mr. Nolies through his own testimony on direct and cross-examination.

grooves that serve as guides on the frame of the '211, nor do the lugs bear a significant relation to the '211 rails, which extend the length of the magazine. Another consequence of the lug and slot construction of the '643 is the necessity to disassemble in order to reload. This is a significant difference from the practice and teaching of claim 4.

The second distinguishing feature of claim 4 that defeats the anticipation claim is the alignment and retention pin. A fair reading of both claim 4 and the specifications make it clear that the pin of the '211 fits snugly into the corresponding aperture of the cartridge and aligns the cartridge with the anvil. The same cannot be said of either the '643 or the UTL–70. In neither does the pin fit snugly. Instead, the shape of the cut-outs does not permit a snug fit for the pin and does not permit an alignment function in substantially the same way as the '211. This especially is true of the '643 itself, which teaches that the pins are at ninety degree angles to the instrument frame.

The uniqueness of the teaching of claim 4 is the precision and ease of insertion and alignment of the cartridge. Once the rails of the cartridge are slid along the length of the receiving grooves, and the pin is snugly inserted, the user is assured of maintaining the proper alignment. The same cannot be said of either the '643 or the UTL–70.

### b. O'Dea '863

The defendant next contends that the disclosure of a stapling cartridge containing pusher fingers separated from a pusher rod is anticipated by both the American Vascular Stapler and Mallina's article in the *Scientific American.* The analogy attempted to be drawn by the defendant between the bushing assemblies in Mallina's work and the cartridge of the '863 is not consistent with the teachings of the '863 or the prior art references.

The primary feature of the invention disclosed by the '863 is a disposable unitary staple cartridge with internal drive members. The '863 cartridge is a self-contained unit that easily is inserted in and removed from the instrument. On the other hand, both prior art references teach a relatively intricate procedure for assembly and disassembly of the various components of the bushings, none of which is capable of performing the necessary function alone. Moreover, Mallina's '654 was cited during the prosecution of the '863 and was a prototype of the vascular stapler marketed commercially. The Examiner did not find the '654 to render the '863 unpatentable. The language of the '654 makes clear that a "semi-cylindrical staple bushing half" is not complete without the second staple bushing half, and cannot perform a function analogous to that of the cartridge taught by the '863.[12] The teaching or specifications of the '654 in this regard are no different from that of the commercial stapler. Thus, it is clear that the assembly and operation of a bushing half does not at all anticipate the '863. It also is interesting to note that all the vascular staplers in evidence employ pusher fingers separated from the pusher rod, but no one, including Mallina during his work on linear staplers, developed a unitary cartridge similar to the one taught by the '863.

The defendant also argues that claim 9 of the '863 is anticipated by the Hirsch '211. Claim 9, which is set forth in the margin, has not been asserted by the plaintiff in this action.[13] In particular, the defendant contends that claim 9, in which the shape of the staple slot is defined,

---

**12.** In fact, as the plaintiff's expert, Mr. Noiles, testified on cross-examination, it is the severalty of components and other hardware associated with the vascular anastomosing art that has prevented the transference of the teachings of the art to that of the linear staplers. Tr. at 3914.

**13.** Claim 9 of the O'Dea '863 reads as follows:
A staple-carrying cartridge for use with a medical stitching instrument and the like having a front face, a plurality of staple-seating slots extending through the cartridge and communicating with said front face, each side of said slot defining the width thereof having a groove therein to receive one leg of a staple, and the sides of said slot defining the thickness thereof being spaced a distance greater than the thickness of a staple adapted to be received therein.
PX–4 at col 8, lines 65–73.

reads on the slot shape of the '211. When evaluated in conjunction with the figures and specification, the Court cannot conclude that the defendant has met his burden. For instance, the groove in the slot on the O'Dea differs slightly in size and placement from that in the '211, and the staple in the '211 touches one of the walls of the slot, while the staple in the '863 is spaced from both walls. The effect of the differences of the groove are more significant than the differences in their appearance, in so far as the design of the '863 is more apt to prevent the staple from extruding backwards into the cartridge instead of following through the anvil. Also probative of the failure, on this record, of the '211 to anticipate the '863 is the fact that the same Examiner had under review both applications at the same time. *Cf. Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1455–57 (Fed.Cir. 1984) (no fraud for failure to disclose a prior art reference during the prosecution of a patent where, *inter alia,* the patent examiner had been the examiner for the prior art reference).

### c. Green '533

Claim 22 of the '533 discloses a bi-level groove that extends into the surface of the anvil. The upper level, or portion, gradually slopes into the lower portion, and also flares into the "working surface" of the anvil—the flat, planar surface into which the grooves are carved. While the upper portion guides the staple, the lower portion has a steeper slope engineered to form the B-shape staple. The defendant claims that the invention of the '533 lacks novelty because it was anticipated by the McGill '316.

Figures 12 and 13 of the '316 paper stapler patent show a cross-section of an anvil groove. The defendant contends that the walls of the anvil groove depicted are vertical, but flare outwardly at top. The language of the patent that corresponds to the two figures states: "The ends of the cross-groove ... of the anvil-plate are represented in the drawings flaring outward as well as upward. The object of their outward flare is to overcome any slight displacement of the staple-shanks in passing through the articles being bound." Def.Ex. 1724, at 3.

The material differences between claim 22 and the prior art reference are several. First, although the figures in the '316 are not particularly clear, close inspection of the patent, illuminated by the direct and cross-examination of the plaintiff's expert at trial, reveals a groove flared only at each longitudinal end of the groove, and those flared portions extend all the way to the bottom of the groove. So, there are no flares in the same place as the vertical walls, whereas the '533 has the flared portion leading only into, or as far as, the vertical walls of the lower portion.

Second, the '316 discloses a staple forming groove with an entirely flat bottom, which is not capable of bending the staple upward into the B-shape as disclosed in claim 22. Thus, although the '316 discloses flares to control displaced staples, it does not disclose a two stage construction that first aligns, then controls the bending up of the staple. Third, claim 22 discloses a "working surface" of its anvil that serves to compress and grip the tissue prior to, and during the stapling procedure. The '316 anvil slopes from one level to another, and does not appear to be capable of performing this function in substantially the same way, if at all.

Before and during trial, it appeared that the defendants were asserting other prior art references, including wall sockets and funnels, as having anticipated the '533, but the defense has failed adequately to assert those references in the post-trial findings and conclusions. Not only has the defendant failed to meet his burden of proving those claims of anticipation, but they are deemed abandoned on this record. Of particular note, however, is the defendant's assertion at trial of the Cavanagh '331 paper stapler. The '331 discloses an anvil construction typical of most paper staplers in that the sides of the groove taper downward and inward to the bottom of the groove, and its bottom is continuously rounded from the upper face of its anvil at its outer end and inwardly toward the center of the anvil. The Patent Examiner

rejected claims 22 and 23 of the '533 as originally submitted as being fully met by the Cavanagh patent. Amendments to the '533 eventually were accepted, including one amendment that distinguishes the flares in claim 22 as extending into the groove an amount less than the depth of the groove. Although the Cavanagh patent discloses a tapered groove, it is not akin to the dual portion construction of the '533, and cannot be said to anticipate the '533.

#### d. Green '591

The defendant argues that claim 15 of the '591 is anticipated by the King '675, a patent of which Green was a co-patentee.[14] The parties have stipulated that all elements of claim 15 are included in the prior art '675 except for "the element relating to the longitudinal relationships of the pairs of staple-carrying grooves, the longitudinal relationships of the pusher bar cam surfaces, and the relationship between these relationships." Plaintiffs Reply to Blackman's Findings 156–157. Stated more simply, claim 15 of the '591 discloses a feature that is designed to aid in the reduction in firing forces, which facilitates a smooth ejection force throughout the operation and would result in a decrease in the likelihood of staples binding when fired. The plaintiff contends that it is this feature that distinguishes it from the '675.

One of the ways in which the intended effect of claim 15 is accomplished appears in the assembly of the push bar cam wedges. The assembly embodied in the '591 is such that the tips of the wedges are not even, while the '675 teaches that the front end of the push bar cam wedges are even. The interrelationship between the double pushers and the staggered pusher bar assembly in the '591 results in the staggering of peak staple ejection forces experienced as the pusher cam bar proceeds through the cartridge. The resulting peaks, though more in number, are less in magnitude. A review of the record does not persuade the Court that the '675 claims a construction

that either staggers the ejection forces, or serves substantially the same function as disclosed in the '591.[15]

#### 2. Obviousness

■ A patent is not valid if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. Obviousness ultimately is a question of law that may be resolved by the Court following a four part factual inquiry that includes:

(1) the scope and content of the prior art;
(2) the difference between prior art and the claims at stake;
(3) the level of ordinary skill in the art;
(4) objective evidence of nonobviousness (commonly known as objective considerations or secondary factors)

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966); *e.g., Azko N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1480 (Fed.Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). In the instant matter, the *Graham* analysis must be applied to the Green '533 and '591—the only two patents in suit to which the obviousness defense has been raised.

*The Level of Ordinary Skill in the Art*

■ To ascertain the level of skill in the art, the Court should consider the following factors:

(1) the educational level of the inventor;
(2) type of problems encountered in the art;
(3) prior art solutions to those problems;
(4) rapidity with which innovations are made;
(5) sophistication of the technology; and,
(6) educational level of active workers in the field.

*Environmental Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed.Cir.

---

**14.** The defendant apparently has abandoned any anticipation defense as to claim 9 of the '591.

**15.** *See infra* note 20.

1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

The patents in suit were developed during the period 1963–66, thus establishing a reference point for determining the level of skill in the art. 35 U.S.C. § 103; *see Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1574 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed. 2d 836 (1987).[16] The requirements for surgical stapling devices are unique, and the art virtually is *sui generis,* there having been only approximately two hundred people working throughout the field during the relevant period. Not until the Russian Institute was founded had there been any real development in the art, and many of the devices that benefitted from those developments were not amenable to mass production or widespread use in the modern surgical setting.

The hypothetical person of ordinary skill in the art at the time was a model maker working on the development of surgical stapling devices. The background of such a person included at least four to seven years as an apprentice to a machinist, model maker, or toolmaker followed by several years in the surgical stapling field. Thus, although the hypothetical person had relatively no inventive facility of his own, he was capable of solving many of the problems encountered by those using the instruments, and he was aware of many of the developments in surgical stapling that had come before his work. The hypothetical person also may include a designer or one who had had an engineering background and had a background in mechanical arts, drafting and design, or tooling design.

The Court also heard evidence regarding the level of skill of many of the patentees of both the patents in suit and the prior art. These inventors, such as Ulrich, Strekopitov, and Mallina, though relevant to the determination of the level of skill in the art, exhibited abilities, knowledge, and expertise above that expected of the person with ordinary skill in the surgical stapling field

during the relevant time frame. *See Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 874 (Fed.Cir.1985); *cf. Stratoflex v. Aeroquip Corp.,* 713 F.2d 1530, 1538 (Fed.Cir. 1983) (section 103 does not include a determination of whether the invention would have been obvious to "a rare genius in the art"). It is noteworthy that not even all those credited as having attained an extraordinary level of skill in the art have to their credit patents capable of performing functions substantially similar to those of the patents-in-suit.

*The Prior Art and the Patents-in-Suit*

The *Graham* inquiry must focus on the claimed subject matter as a whole, not just the elements of a claim or their individual novelty, nor just the differences between the prior art and the claimed invention. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1568 (Fed.Cir.1987), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Richdel, Inc. v. Sunspool Corp.,* 714 F.2d 1573, 1579 (Fed.Cir. 1983); *Stratoflex,* 713 F.2d at 1537. The differences between the prior art and the claimed invention, are, however, an aid to the inquiry, *Stratoflex,* 713 F.2d at 1537, as such differences "may ... be[ ] the key to success and advancement in the art resulting from the invention." *Jones v. Hardy,* 727 F.2d 1524, 1528 (Fed.Cir.1984). In this regard, it is of no significance that the patents-in-suit are the combination of several elements, some of which have been known and in use for some time. *Richdel, Inc.,* 714 F.2d at 1579–80; *Stratoflex,* 713 F.2d at 1537. The Court also must be constrained from finding obviousness "by combining the teachings of the prior art to produce the claimed invention, absent some teaching or suggestion supporting the combination." *ACS Hosp. Systems, Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1577 (Fed.Cir.1984).

#### a. Green '533

The anvil groove disclosed by the '533 is the product of a collaborative effort of several engineers confronted with the prob-

---

**16.** It is important to focus on the relevant time period to avoid viewing the patented inventions through hindsight. *See, e.g., W.L. Gore & As-* *soc., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1553 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

lem of designing a precision stapling instrument capable consistently of firing staples formed in an acceptable B-shape. The defendant claims that the anvil groove disclosed in claim 22 is an obvious modification to the O'Dea '863,[17] and, further, that the claim also is rendered obvious by a household funnel. Although not raised clearly in the post-trial findings and conclusions, the defendants also relied at trial on early devices such as the Hultl and Friedrich surgical instruments, and several paper staplers, as well woodscrews and wall sockets, to sustain the defense of obviousness.

The scope of the pertinent prior art is that "reasonably pertinent to the particular problem with which the inventor was involved." *Stratoflex*, 713 F.2d at 1535 (citation omitted); *see Orthopedic Equip. Co., Inc. v. United States*, 702 F.2d 1005, 1009 (Fed.Cir.1983). Stated another way, "if the inventor of the patent-in-suit could reasonably have been expected to look to a reference to solve the problem which the patent-in-suit allegedly solves, that reference is pertinent art." *General Motors Corp. v. Toyota Motor Co., Ltd.*, 467 F.Supp. 1142, 1154 (S.D.Ohio 1979), *aff'd in part and rev'd in part on other grounds*, 667 F.2d 504 (6th Cir.1981), *cert. denied*, 456 U.S. 937, 102 S.Ct. 1994, 72 L.Ed.2d 457 (1982).

The evidence indicates that the paper stapling art is not one that would lend itself to the resolution of the problems encountered in surgical stapling, or those solved by the anvil groove disclosed in claim 22. There are many bases in the record to support this conclusion. For example, Green himself stated that there was a vast difference between paper and surgical staplers, and if he ever referred to one at all, it was only for a moment before he realized that it offered little or no guidance. Noiles, the plaintiff's expert, concluded that, because the functions and materials of the paper staplers are different from those in the surgical field, the paper staplers were not pertinent. He also testified that Dr. Ravitch, recognized by many as an expert in

the surgical stapling field, made an attempt to utilize a paper stapler in a surgical procedure that Ravitch, himself, admitted was disastrous. On the other hand, in a passing, and somewhat innocous reference in the *Scientific American* article, paper staplers were mentioned as part of the evolution of surgical staplers, perhaps suggesting that the paper stapling art has lent itself to the surgical field. Even though paper staplers, particularly the Cavanagh and Greenfield patents, were cited during the prosecution of the '533, the Court is not persuaded that anyone other than those with less than ordinary skill in the art would refer to paper staplers.

Similarly, the Court is not persuaded that the other references urged by the defendant are pertinent. There is no clear indication in the record that one of ordinary skill in the art would have referred to a funnel, wood screw, or wall socket in resolving the problems at hand, even though many engineers in the field, including those employed by Blackman, had familiarity with such devices. In fact, it was the testimony of Green, the inventor, that he did not recall referring to those devices, and that, in hindsight, they were analogous only in a general way. The Court is of the view that the scope of the pertinent prior art should be limited to the surgical stapling instrument art; an art that calls for much more precision than those cited by the defense. This conclusion is consistent with Blackman's own concession that surgical stapling is a "specialized field."

Even were the paper staplers pertinent art, they could not be found to render the '533 obvious. The Court bases this conclusion on the relevant findings already made herein, particularly in relation to the anticipation claims, as well as those findings that follow. The plaintiff's expert, Noiles, testified that generally paper staple anvils are fairly open and have a flat or rectangular construction, which tends to bend the staples in one direction along the longitudinal axis. Furthermore, the anvil

17. The plaintiff concedes that the O'Dea '863 discloses all elements of claim 22 except for the claimed anvil groove.

does not play a particularly crucial role in bending the staple into a particular form. Instead, the ends of the paper staple tend generally simply to fold back toward the crossbar, and in most cases the staple goes to the far side of the paper and just lies in place.

The anvil groove disclosed by the Cavanagh '331 is typical of most paper staplers in that its sides are tapered downwardly and inwardly all the way to the bottom at a straight angle. The '331 does teach a rounded bottom of the anvil groove, but this could not be relied upon to form staples of uniform shape, especially to the degree and consistency required of surgical staples. The McGill '316 disclosed a flared anvil groove, but the flares extend all the way to the bottom of the groove.

The prior art surgical staplers generally disclose an anvil groove with either a flared or unflared straight V-shape, or a spoon shape, often depending upon the type of staple material. For instance, if round wire is used, the groove is either unflared as in the Hultl and Russian instruments, or with a flare that extends all the way to the bottom, as in the Mallina construction. If flat wire is used, the groove tends to be much wider and flared all the way to the bottom, as in the von Petz instrument. The Friedrich instrument teaches an exceptional half-moon shape.

None of the prior art relied upon by the defendants discloses the dual portion anvil groove of the '533, that is more "forgiving" of residual misalignment of staples, and more conducive to interchangeability of parts and mass production. The defense's attempt to combine two references, by placing the flare of one on top of the groove of another is unavailing, and is viewed by the

Court as an impermissible hindsight reconstruction. *See Panduit Corp.*, 810 F.2d at 1575 n. 30; *see also W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed.Cir.1983).[18]

### b. Green '591

The defense contends that claim 15 of the '591 is rendered obvious by the King '675, in that the staggering effect taught by the '591 is a well known expedient in engineering to level forces, and would have been an obvious modification to one of ordinary skill in the art.[19] The contention appears to be belied by the evidence.

Green testified that there had been many problems encountered by use of the GIA instrument, including the jamming of staples, and the excessive force necessary to push the pusher bars. Green attempted to help correct those problems in the '675 by changing the pusher, including rounding it out and polishing it. These changes, however led only to marginal improvements. Eventually, the shape of the pusher was changed from a circular protrusion to an angular protrusion, and this is what was embodied in the '675. This advancement still did not resolve satisfactorily the force and jamming problems, although the force occasionally was within acceptable levels.

The problems of the '675 were not resolved satisfactorily until the developments embodied in the '591: specifically, the corresponding double pushers (disclosed in claim 9) aligned transversely across the knife bar paths and the front tips of the pusher bars staggered in the longitudinal direction (claim 15).[20] The testimony regarding the evolution of claim 15, and a

---

**18.** The Court notes that the veritable shotgun approach taken by the defense by relying upon several and remote references adds little to the merits or credibility of the defense. *Ling–Tempco–Vought, Inc. v. Kollsman Instr. Corp.*, 372 F.2d 263, 268–69 (2d Cir.1967).

**19.** Although raised before and during trial, Blackman apparently has abandoned his obviousness defense to claim 9 of the '591.

**20.** The Court notes that claim 15 is not limited to the exemplary embodiment of the '591 in

which the pusher bar cam surfaces are transversely aligned. It also may cover different combinations of grooves and aligned cam bar surfaces that result in the staggering of peak ejection staple resistive forces. Claim 15 does require, however, that any such combination include "at least one row of staple-carrying grooves disposed along each of said guide paths." It is not impermissible for a claim to apply to more than the exemplary embodiment. *Autogiro Co. of America v. United States,* 384 F.2d 391, 398, 181 Ct.Cl. 55 (1967).

view of that claim as a whole, does not support the assertion that the staggering was a well-known resolution or an obvious modification, but in fact, the concept occurred to only a few, if more than one of the many persons of ordinary skill who were working on the project.[21]

Although apparently now abandoned, the defendant at trial relied also on the Bobrov '606, Fisher '300, and the Hultl instrument. On the present record the defendant has not met his burden to support the analogy of the star wheel construction taught by the Hultl and Fischer devices to the pusher bar assembly of the '591. At any rate, none of these three references appear even to approach the staggering of peak staple ejection forces, and cannot be said, on this record, to render claim 15 obvious.[22]

*Objective Considerations*

When present, objective indicia of nonobviousness, such as "commercial success, long felt but unsolved needs, failure of others, etc.," *Graham,* 383 U.S. at 17–18, 86 S.Ct. at 694, "must always be considered *before* a legal conclusion under § 103 is reached." *Hardy,* 727 F.2d at 1530 (emphasis in original). In fact, the Federal Circuit has held that, depending upon the relationship of the secondary indicia to the merits of invention, *Garlock, Inc.,* 721 F.2d at 1555, such "considerations may often be the most probative and cogent evidence in the record," and "may often establish that an invention appearing to have been obvious in light of the prior art was not." *Stratoflex, Inc.,* 713 F.2d at 1538.

The plaintiff urges the Court to review several of what it views as objective considerations present here. These include: the commercial success of USSC's patented products; the apparent fulfillment of the long felt need for surgical stapling devices for use in operating rooms on a large scale, especially after the repeated failure of others to fulfill that need; defendants' own tributes to the plaintiff's products; defendants' copying and use of plaintiff's products; the acquiescence of the medical instrumentation industry in the validity of the patents-in-suit; and the receipt by USSC of an award for its work. The defense counters by asserting that the commercial success of the products is nothing more than the result of an overbearing sales methodology.

In 1967, USSC commenced sales of those products that incorporate the patents-in-suit. Prior to that time USSC and its predecessors' only revenue from surgical stapling equipment came from Russian designed and imported instruments. From 1967, plaintiff's sales grew from $481,000 to more than $145,000,000 in 1982. The TA, GIA and DLU products accounted for the majority of USSC's more than $500,-000,000 of revenue acquired between 1967–1982. In fact, of the 1982 revenue, more than half was attributable to USSC's own surgical stapling products.

Part, but certainly not all, of plaintiff's rapid success is attributable to the aggressive training program it instituted in 1967 as part of its marketing strategy. As part of the program, nurses employed as "professional consultants" by the plaintiff would instruct surgeons in the use of the products. If the plaintiff could ensure the proper use of its products, Mr. Hirsch, the principal of USSC, felt the instruments would be used more frequently, the products would sell themselves, and increased sales in the future of the DLUs and accessories would be virtually guaranteed. The connection between USSC's increased revenues and the patents-in-suit becomes clearer when sales of some other USSC products are examined. For example, the same training program was instituted as part of the sales strategy for a USSC prosthetic hip and an "I.V. ometer," but neither proved to be a commercial success.

The AUTO SUTURE devices have been accepted widely and praised throughout the

---

**21.** At trial, primarily as an attack on the validity of claim 9, defense counsel attempted to demonstrate a staggering in the '675 staple ejection to show that the staggering was an obvious modification, but the demonstration utilized only two of the four rows embodied by the '675. Such a hypothetical reconstruction is of no avail. *See Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1575 n. 30 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

**22.** *See infra* note 24.

medical profession as reliable and dependable, and have been acknowledged as instrumental in making surgical stapling a practical art in the profession. The same cannot be said, however, of the earlier stapling devices, and the repeatedly unsuccessful attempts to supplant manual suturing procedures in hospital operating room conditions. For at least fifty years, from Hultl to the Russian Institute, no one produced practical devices that met the level of USSC's success. Most significant in this regard is the fact that those skilled in the art were relatively few in number and were aware of the achievements of both their contemporaries and predecessors.

Even the defendants recognized USSC as responsible for the veritable revolution in surgical stapling. The defendants' opinion of the AUTO SUTURE products also is evident by the fact that they copied the products and went to great lengths to recreate the anvil groove of the Green '533. Others in the surgical stapling industry apparently have recognized the utility and promise of plaintiff's products, as several of the larger companies in the industry have distributed plaintiff's goods, or have sought to acquire the company. Lastly,

Hirsch is the only non-physician to be awarded the "Prix Nessim Habif" by the University of Geneva for his contributions to surgical instrumentation.[23]

The Court concludes that these factors weigh heavily in the determination of nonobviousness. *Cf. Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1546 (Fed.Cir.1984); *Panduit Corp. v. Dennison Mfg. Co.,* 774 F.2d 1082, 1099 (Fed.Cir.1985), *vacated on other grounds,* 475 U.S. 809, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986), *on remand,* 810 F.2d 1561, 1569, 1571 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

Having reviewed the proposed findings and conclusions and the relevant evidence, and after all due inquiry and consideration, the Court is not persuaded that the defendant has met his burden of proving the patents in suit are invalid as obvious under 35 U.S.C. § 103, or as anticipated under § 102.[24]

### 3. Technical Defenses
#### a. Best Mode

The patent specification "shall set forth the best mode contemplated by the inven-

---

**23.** The findings made herein also support a conclusion that the claimed subject matter of the patents-in-suit fulfill the utility requirement of 35 U.S.C. § 101. *See Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1268–69 (Fed.Cir. 1986) (a claim of non-utility is a question of fact that may present a successful challenge to the validity of a patent if total incapacity is proven by clear and convincing evidence), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987).

**24.** The Court notes that in reexamination proceedings before the United States Patent and Trademark Office, the Green '591 was found not to be anticipated or rendered obvious by the prior art, particularly the '675 patent (although claim 15 was not the sole focus of the reexamination). Consequently, the burden of proving invalidity by the defendant becomes a bit more difficult to sustain. *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1364 (Fed. Cir.1984).

The PTO determined that, although the "'675 is probably the closest prior art to the **disclosure** of the '591," there are other prior art references, such as Von Petz, that are closer to the claims of the '591. PX 8317 at 5. It also is noteworthy that the PTO did not bolster its determination of nonobviousness with a finding regarding commercial success, but found nei-

ther the record upon reexamination, nor the record compiled before this Court to properly support such a finding. In this regard, the PTO found lacking an affidavit or declaration of commercial success, and sufficient indication that plaintiff's success was not due to "heavy promotion or advertising, shift in advertising, consumption by purchasers normally tied to [the patent] applicant or assignee, or other business events extraneous to the merits of the claimed invention." PX 8317 at 6. The Court defers to the PTO's expertise in evaluating the prior art, but in light of the evidence on this record regarding secondary considerations or commercial success, the import of which may be understood without the benefit of any particular expertise, the Court does not defer to that portion of the reexamination decision. In this regard, the Court acknowledges that commercial success, when the product of overly extensive or skillful marketing, should not be found as probative of nonobviousness. Even so, the instant record evinces other compelling objective indicia of nonobviousness. *See Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1428–29 (Fed.Cir. 1988) (providing support for the conclusions herein, and background of the '591 reexamination proceeding).

tor of carrying out his invention." 35 U.S.C. § 112. To show that this requirement is not satisfied, the defendant must prove "that the applicant knew of and concealed a better mode than he disclosed." *Hybritech Inc.*, 802 F.2d at 1384–85. The defendant may meet this burden by proving that the "quality of an applicant's best mode disclosure is so poor as to effectively result in concealment." *DeGeorge v. Bernier*, 768 F.2d 1318, 1324 (Fed.Cir.1985).

The defense has taken the position that the plaintiff failed to disclose the best staple shape for practicing the '211 and '863. The preferred staple shape, in which the legs of the staple flare outward, was disclosed in the '533, but known and used in the art at the time of the '211 and '863 applications. For support of this defense, the defendant has cited a portion of the direct examination of Dr. Freudenstein. Because that testimony has been ordered stricken from the record, it is clear that the defendant has not met his burden.[25] Although the plaintiff has responded to the merits with a persuasive argument, the Court need not reach them on the present record.

### b. Enablement

Under the disclosure requirements of 35 U.S.C. § 112, a patent specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same." This commonly is called the "enabling" requirement. "Enablement is a legal determination of whether a patent enables one skilled in the art to make and use the claimed invention." *Hybritech Inc.*, 802 F.2d at 1384. Disclosure should be held to be adequate "[i]f the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits." *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (quoting *Georgia–Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), *cert. denied*, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958)). The defendant contends that claim 2 of the Green '591, upon which claim 9 of that patent depends, does not disclose sufficiently the balancing function of the positioning of the cam. The only testimony cited by the defendant to support the claim is the testimony of Noiles, the plaintiff's expert.

More specifically, the defendant contends that claim 2 reads simply that forces are balanced around the cam, which is "symmetrically positioned in the longitudinal direction relative to the two drive sections," but, in practice, there is no balance of forces as set forth in the claim. Rather, as Noiles testified, there is balance only around the longitudinal and transverse axes, and that "balance" does not mean actual balance, but only a "better balance."

The forces to which claim 2 pertains are the staple ejection forces. The double pusher arrangement of the patent is designed to virtually eliminate the primary turning moments about two axes, because during staple ejection the tendency of one half of the pusher to rotate in a clockwise sense is offset by the tendency of the opposite half of the pusher to rotate in the counterclockwise sense. The specification speaks to the balanced moments that result from the double pusher:

> By virtue of the symmetrical arrangement of sections 198 of the drive member, two staples are simultaneously ejected and, in this way, only balanced moments are developed about the drive member apex 218 so as to prevent turning or skewing of the drive member both in the transverse and longitudinal planes.

PX 10 at col. 7, lines 10–15. Thus, the balancing of forces referred to in claim 2 are the forces relative to the transverse and longitudinal planes only, leaving open the possibility of unbalanced moments in

---

**25.** On January 20, 1987, the Court ordered the direct testimony of Dr. Freudenstein stricken because of Blackman's assurances that he would not be able to make Dr. Freudenstein available for cross-examination.

the vertical plane. Since the unbalanced moments in the vertical plane may cause secondary unbalanced moments in the other two planes, it should be clear to one skilled in the art that the balancing referred to in the claim pertains only to the primary moments resulting from the primary input forces. Noile's testimony regarding a relative balance or "better balance," within part of the system is consistent with this reading.

The defendant next contends that claim 2 defines the cam as being positioned in the longitudinal direction, yet Noiles testified that such positioning does not effect the balancing of forces around either the longitudinal or vertical axes as the patent purports to do. The parties accept as true Noiles's testimony that the symmetrical positioning feature of claim 2 does not affect the balance of forces in either of the longitudinal or transverse planes. However, as Noiles also testified, the symmetrical positioning of the cam along the longitudinal axis as disclosed in claim 2, does tend to result in the balancing of staple ejection forces around the vertical plane. The overall effect disclosed in claim 2 is the balancing of moments about two axes, and a decrease of imbalance of moments in the third axis.

To the extent the defendant relies on any distinction to be drawn between "balance," (i.e. literal balance), as used in the language of the specification, and "better balance," the language used by Noiles when describing the invention, it is not sufficient to invalidate the claim for inadequate disclosure. The term "balance" must be considered in a relative sense: the degree of balance of staple ejection forces permitted in the patented system. The defendant has not proved that those skilled in the art would find claim 2 non-enabling, or the language indefinite. *See Garlock, Inc.,* 721 F.2d at 1556; *DeGeorge,* 768 F.2d at 1323–24 (since an inventor is speaking to those skilled in the art, it is not necessary to explain every detail); *see also Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1571 (Fed.Cir.1983) (claims should be construed as they would by those of ordinary skill in the art). This conclusion is buttressed by evidence of defendants' copying and infringement of the patent.

### c. Improper Inventorship

■■■■ A patent for an invention made by more than one inventor must be filed in each of the inventor's names. 35 U.S.C. § 116.[26] The fact that a patent is issued in the name of an inventor or inventors, is prima facie proof of inventorship. *James-bury Corp. v. United States,* 518 F.2d 1384, 1395, 207 Ct.Cl. 516 (1975) (citing *Acme Highway Products Corp. v. D.S. Brown Co.,* 431 F.2d 1074, 1082 (6th Cir. 1970), *cert. denied,* 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971)).[27] Misjoinder, i.e. the making of a patent application by one who has not contributed to the invention, is a technical defense to the validity of the patent that may be sustained by the defendant only by strong, clear and convincing evidence. *Celestron Pacific v. Criterion Mfg. Co., Inc.,* 552 F.Supp. 612, 615 (D.Conn.1982) (citing *Acme Highway Products Corp.,* 431 F.2d at 1082). It is the defendant's position that, because Green admitted that he invented by himself the design of the anvil groove as incorporated in claim 22 of the '533, the patent is void because of the joinder in the application of Soltanoff and King.

Near the end of 1965, Hirsch engaged the services of Van Dyck Associates, a consulting firm, to make improvements to the then existing TA and GIA devices. One of the projects of particular importance facing Van Dyck engineers David Green, Phillip King and Louis Soltanoff, was the inability to obtain consistently B-

---

**26.** *See also* 35 U.S.C. § 102(f) ("A person shall be entitled to a patent unless ... he did not himself invent the subject matter sought to be patented.").

**27.** Holdings of the Court of Claims have been adopted as precedent by its successor, the Court of Appeals for the Federal Circuit, when those holdings relate to areas of law within the substantive jurisdiction of the Federal Circuit. *South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982).

shaped staples. Their work eventually led to the filing of the '533 patent.

During a deposition before trial, Green testified that he did not recall any input from either King or Soltanoff into the anvil groove design eventually incorporated by the '533. At trial, however, Green testified that the anvil groove design was his basic idea, and that he was the prime mover in getting it done. At the time of the development of the '533, the engineers at Van Dyck worked in groups, the members of which regularly met, interacted, and exchanged ideas. The three patentees regularly interacted in this setting in an effort to solve the problem of proper staple firing and formation. Given this scenario, and after reviewing the testimony of Green, it is clear that although Green felt the idea for the anvil groove was "his," it really was the product of the work of all three. *Cf. Acme Highway Products Corp.*, 431 F.2d at 1083 (presumption of proper inventorship is based on the strong "temptation for honest witnesses, who have worked years with a patentee to implement his ideas, to forget whose ideas they were").

▇▇▇▇ Joint patent application is not inappropriate even though the inventors did not physically work on the patent at the same time, did not make the same type or amount of contribution, or did not make a contribution to the subject matter of every claim of the patent. *See Jamesbury Corp.*, 518 F.2d at 1395–96; *Rosemount, Inc. v. Beckman Instruments, Inc.*, 569 F.Supp. 934, 941 (C.D.Cal.1983), *aff'd*, 727 F.2d 1540 (Fed.Cir.1984). Thus, the defendant could succeed on his theory, for example, if he were to prove that neither King nor Soltanoff made some contribution to the final conception of the anvil groove, *Jamesbury Corp.*, 518 F.2d at 1395–96, and that the invention of claim 22 is "independent and distinct" from the joint invention of the other claims of the patent. *Vekamaf Hol-*

*land B.V. v. Pipe Benders*, 211 U.S.P.Q. (BNA) 955, 966 (D.Minn.1981). On the present record, the Court is not persuaded that either can be said with sufficient certainty.[28]

## III. ENFORCEABILITY

### 1. *Inequitable Conduct*

▇▇▇▇ A successful defense of inequitable conduct in a patent infringement action will render all of the claims of the particular patent unenforceable. *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1560–62 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). To succeed on the defense, the defendant must prove by clear and convincing evidence "at least threshold levels of materiality and ... intent to mislead." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed.Cir.1988) (citing *Lex Tex Ltd.*, 747 F.2d at 1559); *see Driscoll v. Cebalo*, 731 F.2d 878, 884 (Fed.Cir.1984) (a material omission or misrepresentation must be proved by "clear, unequivocal, and convincing evidence"). The threshold level of materiality is met "if there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent." *Cabot Corp.*, 845 F.2d at 992. The threshold intent "may be proven by showing acts the natural consequences of which are presumably intended by the actor." *Lex Tex Ltd.*, 747 F.2d at 1560. A showing of gross negligence, as opposed to "simple negligence, oversight, or an erroneous judgment made in good faith" also may be sufficient. *Id.* In this regard, an actor is grossly negligent if "a reasonable person in his position[ ] should have known of the materiality of a withheld reference." *Id.* Should the defendant meet the threshold levels of evidence the Court must balance both factors and then

---

**28.** Even if the evidence supported a finding that there was inappropriate joinder it would not necessarily invalidate the patent under § 116. The defense, which is technical and looked upon with disfavor by the Courts, will not succeed when joinder is arguably justified, has not misled anyone, and is correctable. *Vekamaf*

*Holland B.V. v. Pepe Benders*, 211 U.S.P.Q. (BNA) 955, 967 (D.Minn.1981); *see* 35 U.S.C. § 256 (misjoinder may be cured if the misjoinder occurred through error and without any deceptive intention); *see also Celestron Pacific v. Criterion Mfg. Co.*, 552 F.Supp. 612, 615 (D.Conn.1982) (discussion of §§ 116 & 256).

make a legal determination of whether there has been inequitable conduct. *Id.; Cabot Corp.*, 845 F.2d at 992.

### a. Hirsch '211

It is the defendant's position that the '211 is invalid and unenforceable because the Russian UKB instrument, embodied in the Strekopitov '564, was brought to the attention of the examiner, while the examiner was not told about the Russian UKL instrument, embodied in the Gorkine '035.[29] The former does not disclose a pin feature, yet the latter, which was in the possession of the plaintiff during the pendency of the '211 application, does.

The UKL disclosed a forked pin designed to retain tissue; it went around, not through the magazine and performed no alignment function. Furthermore, the UKL, unlike the '211, had to be partially disassembled to replace the staple magazine, which had to be loaded by hand. In view of these features, it is not likely that had the examiner known of the UKL, he would have considered the reference important to the '211.

It is reasonable to conclude, however, that Mr. Custer, the examiner, knew of the UKL at the time of the '211 application. On January 4, 1960, the Russians filed a patent application—which later was abandoned—for the UKL in the name of Gorkine, Strepkopitov, and Garin. The pin was described in the application as:

> a two-pin fork (10), hinged to the head of the staple body and preventing the tissue to be stitched from slipping off and beyond the hook of the supporting body.

PX 114–A at 2. In Office Actions dated April 25, 1960, September 7, 1961, and May 8, 1962, Mr. Custer's name appeared as the Assistant Examiner for the Gorkine UKL application. Moreover, in March 6, 1962 the inventors' attorney submitted an amendment during the United States Gorkine prosecution, which indicated that the examiner had sought a demonstration of the UKL device. Then, in correspondence on April 26, 1962 between the attorneys and the National Patent Development Corporation (NPDC), who were licensed by the Russians to manufacture and market the Russian surgical stapling devices in the United States, it was indicated that such a demonstration of the UKL had taken place. Lastly, Examiner Custer also was the examiner for the O'Dea '863 application. On May 11, 1966, Custer cited the French Gorkine patent against one of the claims of the '863 application. The French Gorkine patent '035 discloses the same UKL instrument as in the abandoned United States application. Of most significance, is the fact that Custer's action listed the '035 patent as being in class 227, subclass 19 of the PTO's classification system. The action was a result of a search conducted on March 4, 1966 of class 227, subclass 19. Earlier in that same month, Custer had searched the same class and subclass during the prosecution of the Hirsch '211, yet did not cite the Gorkine '035 against any of the claims in the '211.

Against this background, and without evidence sufficient to rebut, it is not unreasonable to conclude that the UKL, with a pin feature for tissue retention only, was no more material or relevant than the UKB without a retention pin, which was cited in the specification of the '211 application. Given the similarities between the UKL and UKB, and between the UKL and the '211, it was at most negligent, or an exercise of poor judgment that caused the omission of the UKL reference from the '211 application. Such conduct is not sufficient to hold the patent unenforceable, especially in light of the finding herein that the examiner was likely to have had knowledge of it. *Cf. Environmental Designs v. Union Oil Co. of Cal.*, 713 F.2d 693, 698 (Fed.Cir.1983) (nondisclosure of prior art not fraud where prior art already was known and of record before examiner), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383–84 (Fed.Cir.1983) (non-

---

**29.** In the defendant's post-trial proposed findings, Blackman identified the UKL as being embodied in the Strepkopytov '643. Def. Proposed Finding 72. In fact, the '643 is the embodiment of the UTL, while the Gorkine '035 embodies the UKL C-clamp device.

disclosure of prior art reference not material where examiner was aware from another source of the existence of the undisclosed prior art).

### b. O'Dea '863

In an Office Action mailed in May, 1966, Examiner Custer rejected some of the claims of the '863 on the grounds that the Mallina '654 "recognized the desirability of providing separate, staple holding, driver-magazine single use, disposable cartridges that can be pre-sterilized and readily inserted in surgical devices." USSC responded by emphasizing that the '863 application was directed to a "unitary cartridge assembly," and then distinguished the '654 as follows:

> Mallina quite obviously does not disclose a cartridge-drive member assembly which is either removable or disposable as a unit. It is noted that it is mentioned in column 11, lines 30–40 in Mallina that the "bushing halves are discarded." This, however, does not provide for disposal of the staple pusher element 102, this element in Mallina being a permanent part of the instrument itself.

PX–5, Amendment of Aug. 15, 1966 at 12. After receipt of the amendment the claims were allowed on November 28, 1966, and the patent issued. Blackman now contends that USSC misled the PTO by arguing that the pushers in the Mallina '654 vascular stapler patent were not disposable.

There is much testimony and other evidence about sources from which one might learn of the teachings of the Mallina '654, and, more particularly, whether the pushers on the '654 were in fact disposable. In most of those sources however, little or no mention is made of the pusher, or whether it was disposable. The '654 patent application itself discloses disposable bushing halves made of inexpensive plastic, but does not list the pushers as a disposable component. The pushers are part of the same accessory instrument kit as the bushing halves, and not considered to be a part of the instrument *per se*. But, the pushers, or "drive members," appear in the same part of the patent specification as those components that are a permanent part of the instrument, and it is suggested that those components be "made of biologically inert materials such as stainless steel or nickel silver." PX–68 at col. 7, lines 18–21. Neither of the latter substances is likely to be used for disposable parts, but both are known for their ability to sustain the high temperatures associated with sterilization. In fact, in the Mallina '896, a subsequent patent for a vascular stapler, Mallina described the pushers as made of stainless steel or vitallium, the latter being an expensive substance used for its durability, not disposability.

There are other ways the '654 might lead one reasonably to conclude the pushers were not disposable. For example, the '654 discloses disposable staple bushing halves, each with a pusher. The pushers could be removed after each use, cleaned and sterilized along with other metal parts, then reused. The removal of the pushers was accomplished by grasping a flange provided at the rear of each pusher. To accomodate the flange, the pusher had to be made by expensive machining, and was not likely to be disposable.

Other than the patent, there are at least two articles in which Mallina discusses and describes his vascular stapler. In neither the first article, which was prepared prior to the '654 application, nor in the second article, which appeared in the October, 1962 issue of *Scientific American,* did Mallina indicate that the pushers were disposable. In fact, in the *Scientific American* article, an '896 is depicted, which disclosed a vitallium pusher. Also, in January, 1963, Mallina and his colleagues presented papers on their vascular stapler to the New York Academy of Sciences. In the papers, which were published later that year, there was no disclosure of disposable pushers. Perhaps the most persuasive evidence to support the conclusion that the pushers were not disposable, is the testimony of Harry Reimels, a designer and long a co-worker of Mallina, in which he stated that the '654 pushers were not disposable at the time the patent was filed. Reimels testified that it was not until a prototype later in time than

the '654, that the pushers were disclosed as disposable.

The defendant's position seems to hinge on evidence that the disposable bushing halves were sent from the factory with the pushers intact in the accessory instrument package, which was separate from, and for use with, the instrument. Faced with this evidence, Noiles suggested that, once used, the pushers should be extracted from the bushing half by grasping the flange, and then retained for future use with another bushing half, since only the first shipment of bushings from the factory came already assembled with pushers. The defendant characterizes this testimony as incredulous, because the inexpensive cost of the cartridges would make the practice of retaining and reusing the pushers a ridiculous one.

The defendant also focuses on evidence such as a memo found in the NPDC files, and descriptions of the commercial vascular stapler, published as late as March, 1964, which suggest that the pusher is disposable. Also in evidence is a printed brochure from 1963 for the commercial vascular stapler. The brochure indicates that the bushing halves with pushers were disposable, yet there are several differences between the stapler disclosed in the '654 and that disclosed in the brochure.

Throughout the review of the evidence regarding the '654, it is important to keep in mind that the '654 was one of the earlier of five prototypes that eventually and cumulatively resulted in the commercial vascular stapler. The various references disclose different aspects of the stapler and depict its evolution. The Office Action to which USSC responded related only to the teachings of the '654, not all the other references that disclose a variety of the Mallina vascular devices and writings. It also is important that the attorney who prosecuted the application for USSC, Mr. Fleit, was not accused by the defendant of any wrongdoing. Rather, the defense directed their accusations of fraud at Mr. Hirsch, who played no role in the prosecution of the patent applications other than delegating to Fleit and his associates the authority to proceed.

The weight of the evidence leads the Court to conclude that the '654 does not itself disclose a disposable pusher, and that the distinction drawn by USSC when responding to the Office Action in 1966 was not unreasonable. Even were there evidence sufficient on this record to establish that the pushers in the '654 were disposable, there is not sufficient evidence upon which to conclude that USSC knew, during the prosecution of the '863, that the pushers were disposable. Nor is there enough unrebutted evidence to support the conclusion that the USSC response to the Office Action was an intentional misrepresentation. *Cf. Azko N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482 (Fed.Cir. 1986) (not a misrepresentation to distinguish two prior art references, especially when examiner had enough information to draw his own conclusion), *cert. denied,* — U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). The Court also is not persuaded that the defendant has met the threshold level of proof of the materiality of the disposability issue. The most significant feature of the '863 is the unitary assembly of the cartridge that went on as a unit and came off as a unit—a feature that is not disclosed in the '654.

The second fraud allegation with regard to the '863 application is the failure of USSC to inform the examiner of the Hirsch '211 patent; particularly, that claim 9 of the '863 reads on the slot configuration of figure 9 of the '211. The allegation does not sustain a defense of enforceability or invalidity. First, the Court already has disposed of defendants' anticipation claim. Second, Custer was the examiner for both the '211 and '863 which were pending at the same time. The defendant has not provided clear and convincing evidence that Custer was not aware of the '211 and its slot configuration at the time he processed the '863. *See Kimberly–Clark Corp.*, 745 F.2d at 1455–57 (no fraud where, *inter alia,* the examiner had been the examiner for the reference).

### c. Green '533

The defendant contends that the '533 is unenforceable for the failure of the plaintiff during the prosecution of the patent application to disclose to the PTO the Sampson and Ulrich patents, which, the defense argues, teach a stress member pertinent to that taught by the '533. The stress member disclosed in the '533, which extends between the upper ends of the leg portions of the instrument, serves a twofold function. The first is to establish and maintain the vertical and horizontal alignment of the cartridge and anvil, and, secondly, to serve as a tension member to maintain the two leg portions of the stapler in parallel, planar alignment.

The Sampson '637 discloses a surgical stapling instrument comprised of a hinge at one end and a latch mechanism at the other. The patent teaches neither a cartridge nor a removable anvil, consequently there is no alignment function served that is similar to that taught in the '533. Thus, the Court is not convinced by the defendants that the Sampson '637 would have been material to the '533 application. The defendant also has failed to establish that the examiner was not in fact aware of the '637 during the pendency of the '533. Again, Mr. Custer was the examiner for the prosecution of the '533 through the first Office Action, and it was he who had cited the '637 against the co-pending O'Dea '863 application. Absent sufficient evidence to the contrary, one reasonably could conclude that Custer was aware of the '637 during the pendency of the '533 but did not find it to be of sufficient relevance to effect the issuance of the '533. *Cf. Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d at 1455–57.

The Ulrich '527 discloses a threaded screw or reinforcing hook as a tension member, but it does not serve to align the removable magazine with the permanent anvil. The defendant has failed to cite any part of the present record that supports either a conclusion that the '527 is pertinent, or a threshold finding of materiality or misrepresentation.

### 2. *Misuse*

Prior to trial, the defendants proffered a misuse defense premised on USSC's alleged intentional and unauthorized overshipment to hospitals of its products, including the TA and GIA products covered by the patents-in-suit. The defendants claimed that the purpose of the alleged scheme was to inflate artificially the sales and profits of USSC, as well as to create the appearance of the commercial success of its patents. At the very least the proffered allegations, submitted in affidavit form, were intriguing, and included the duplication of orders, fraudulent alteration of valid purchase orders, and the frustration of the efforts of the hospitals to refuse the fraudulent orders or overshipments. The Court denied the plaintiff's motion to strike the defense, and left the defendants to their proof at trial on both the alleged misconduct and its connection to the patents-in-suit. Perhaps because of their apparent inability or failure to proceed at trial with a defense case of any length or substance, the defendants retreated from the position taken earlier. What the Court now is left with are the somewhat bald assertions that the plaintiff's sales methodology and professional consultant program constituted misuse of the patent monopoly. The assertions do not rise to the level sufficient to sustain the defendants' burden of proving its allegations. *See Novo Industri A/S v. Travenol Laboratories, Inc.,* 677 F.2d 1202, 1210 (7th Cir.1982).

## IV. INFRINGEMENT

On January 1, 1973, Blackman was hired by USSC as a Special Products Manager, and eventually was trained in the use and marketing of USSC TA devices so that he could become a dealer for USSC. While in training, Blackman entered a dealership agreement with USSC for the New York City area. With the formation by Blackman of Hospital Products Corporation ("HPC") in September, 1976, the initial dealership agreement was superseded by replacing Blackman as an individual, with HPC. Blackman apparently sought to en-

large his area of responsibility, and in November of 1978, he persuaded USSC to award him the exclusive distributorship of USSC products in Australia. To effect this agreement, USSC terminated its exclusive distributorship in Australia then in existence with Downs Australia Pty. Ltd., and allowed Blackman to purchase the remainder of its inventory.

Throughout his contact with USSC as both a dealer and distributor, Blackman engaged in a series of activities that furthered his own interests, but were inimical to those of USSC. For instance, while in Australia in 1978, Blackman, knowing that AUTO SUTURE was USSC's principal trademark for its surgical stapling devices, caused the unauthorized submission of an application in the name of HPC to register "AUTOSUTURE" in Australia. Again, in July of 1979, Blackman filed a patent application in Australia, which was a literal transcription of the O'Dea '863 and Green '591 patents, as well as of other USSC documents. Blackman was not the inventor of the subject matter of the application, yet filed it with the idea that he could manufacture or market his own goods that he then could label as "Patent Pending."

Moreover, as a USSC dealer, Blackman knew of the availability of DLU demonstration packets—typically containing a dozen cartridges, one anvil, and an alignment pin —that were sold to distributors for a fraction of the market price of regular DLUs. Blackman realized that, by manufacturing the remaining anvils and aligning pins of USSC's DLUs and then packaging those parts with demonstration staple cartridges, one could, after sterilization, sell such "hybrid" DLUs at a substantial profit. Thus, throughout 1977 and 1978, and into 1979, while engaged as the exclusive distributor in Australia, Blackman placed huge orders of the demonstration packets. In late March of 1979, before Blackman's exclusive distributorship in Australia officially was to commence, he arranged for the manufacture of his immitation products by engaging an engineering firm, I.R.D. Engineering, to copy USSC slide pack samples

and to manufacture the following DLU components:

4000 retaining pins

15000 large single "U" Anvil

2700 medium single "U" Anvil

1200 small single "U" Anvil

3600 double "U" Anvil

3600 Pushers complete, very sharp honed blade

PX 770. Eventually, staples were added to the list.

To effect the repackaging scheme, the engineers conducted tests on the feasibility of reloading, resterilizing and reusing spent USSC staple cartridges. After realizing the impracticality of recycling the components, the engineers engaged in a series of procedures to analyze and copy the genuine USSC components. Blackman gave I.R.D. five United States patents issued to Russian inventors, and also gave them a sheet from the drawings of the Green '533, to assist in the understanding of effecting the proper staple formation. Missing, however, were drawings related to the anvil groove configuration of the '533, or any of the text of that patent. Starting with an optical comparator and a toolmaker's microscope to study and recreate drawings of the USSC components, the engineers eventually resorted to reverse engineering. By sometime in the period 1979 through early 1981 a toolmaker's drawing of the anvil groove configuration for HPI's 30, 55, and 90 anvils was prepared for HPI. The transverse cross-sections of the anvil grooves shown in these drawings are not within the scope of claim 22, because these grooves do not have a lower staple nestling portion and an upper staple guiding portion.

By the end of 1979, I.R.D. was producing the needed DLU components, and the Blackman hybrid USSC products began to appear in Australia. Ultimately, more than 20,000 pins and 4000 anvils were produced as part of the scheme. All the while, Blackman, as a bona fide USSC distributor, was operating under the cloak of legitimacy to establish credit to further his own manufacturing operation, and to corner the market for himself, not USSC. Not until

the end of 1979, when Blackman's own operations were well underway, did he terminate his distributorship with USSC. At the time, Blackman owed a substantial debt to USSC that, ironically, he paid in part by returning some of the USSC products that still bore the name of Blackman's company. Once separated from USSC, Blackman continued to obtain USSC products by ordering through fronts such as the Hadassah Medical Relief Association, and at least one doctor.

Although the hybrid products were manufactured and marketed, the initial efforts to imitate the USSC components, including the reverse engineering, were not completely successful, as the imitation anvils failed to form the B-shape staples consistently.[30] The record is replete with evidence of Blackman's far-reaching and elaborate efforts to overcome this problem and to obtain a more exacting copy of the USSC anvil, or at least to find a design that would render a staple with substantially the same formation and consistency of proper formation as that rendered by the USSC design. Blackman, through HPI, engaged over twenty different people, both in-house personnel and outside consultants from the United States and Australia, to determine the root of the failure and to prescribe a remedy. Their efforts are summarized herein only briefly, as the record and plaintiff's proposed findings are clear, with little, if any, rebuttal evidence offered by the defense.[31]

The credentials of the in-house personnel and consultants involved in HPI's project ranged from metallurgists to engineers. They each examined the anvil groove, and conducted their own tests and drew their own conclusions. Some are summarized below:

—An examination and comparison of microscopic photographs of both USSC and HPI staples that had been fired. Professors of metallurgy, Witt and Grant, from the Massachusetts Institute of Technology, who conducted the test, concluded that the HPI staples exhibited more asymmetry than the symmetric shape consistently formed by the USSC devices.

—Professor Witt also took a series of photographs of USSC and HPI anvils that had been cut so as to expose their transverse cross-section. Although the pictures reveal differences in the two shapes—for instance, the right hand side of the HPI anvil was an open trough that is not capable of controlling the proper bend of staples—Witt failed to appreciate their significance.

—Dr. Fisher, a metallurgist from Australia, took several approaches to overcome the engineering problem presented by the anvil groove. These approaches included: changing the anvil material; heat treatment of the anvil; iron nitriding; liquid nitriding; electroless nickel; changing surface hardness; lubrication; and treatment with chromium and tungsten carbide, none of which was successful.

—Jack Kalbfeld, an engineering consultant, conducted a thorough examination, including a review of the cross-sectional photographs of the anvil groove taken by Professor Witt. Kalbfeld concluded that the problem lay in the formation of the anvil, and considered the need to provide a proper longitudinal lead-in to the anvil groove to direct the staple as it entered the staple groove. He did not consider whether a transverse lead-in, as disclosed in claim 22, might resolve Blackman's anvil problem.

The universal conclusion, however was that the USSC anvil consistently formed staples whose shapes were more acceptable than those fired against HPI's anvil.

30. The failure of the imitation anvil grooves was not the only problem. For instance, in early January, 1981, a problem with the fit of the alignment pins and the positioning of the pushers in the cartridges caused HPI to announce a recall of its DLUs intended for use with the USSC TA instruments.

31. Before the trial of this matter was completed, the Court found that the defendants had been less than forthright during discovery regarding the existence of materials relating to the efforts of the defendants to copy the anvil groove design.

There was no quick solution found for the problem, and in late February through at least April 9, 1981, HPI was forced to shut down production. About this time, on February 9, 1981, in the midst of Blackman's and HPI's attempts to solve its anvil problems, USSC initiated litigation in Houston, Texas against a number of parties, including Surgeons Choice. The issue of the litigation was the quality, safety, and equivalency of HPI and Surgeons Choice products, and the ability of those products to form staples in a proper B-shape. While the case was being litigated, efforts still were being made to solve the anvil problem, and a new series of tests were conducted. All of these tests yielded a similar conclusion: that the staples fired against the HPI anvil were of a shape inferior to those fired on the USSC anvil, and that these differences could be attributed to the anvil.

Eventually, Dr. Fisher received for the purpose of resolving HPI's anvil problem, two USSC patents, one of which was a complete copy of the Green '533. It was from a close review of the patent that Fisher discovered the key to the success of the USSC anvil, including the feature that disclosed a transverse lead-in portion. The revelations of Dr. Fisher, as well as information HPI had acquired that related to the material used in the USSC anvil, were incorporated in the HPI design by the middle of April, 1981. The modified design is evident in the production drawings prepared for HPI, which exhibit transverse cross-section views of the anvil grooves. These anvil grooves practice the teachings of claim 22 of the Green '533. The same design was utilized in the ILA DLU, which was introduced commercially in 1982.

The revised design of the HPI anvil in April, 1981, corresponds with the reopening of production of HPI products. Also during this time, HPI caused a whole new series of tests of its new anvil, to both confirm that the problem was solved, and to submit to the Houston litigation evidence of the new efficacy of HPI's product. These tests proved that, although the HPI staples were superior, the USSC and HPI products were comparable when used in practice.

It is clear from the record that as early as 1980 the defendants demonstrated, marketed, and sold DLUs in the United States for use in USSC's surgical stapling instruments, and have manufactured, demonstrated, marketed, and sold surgical stapling instruments of their own in this country. The defendants have gone so far as to cause statements to be made that may be construed as admissions of infringement. For example, on October 28, 1980, HPI submitted to the United States Food and Drug Administration a § 510(k) pre-market notification, signed by Blackman, of its intention to sell its 30, 55, and 90 medium and large series of DLUs, as well as its GA/ANAST (an earlier name for the defendants' ILA DLU). It was stated in the notification that these devices were equivalent to their USSC counterparts. On December 16, 1980, the FDA acknowledged Blackman's claim of equivalence and authorized their production. Similarly, on November 16, 1981, SCI submitted to the FDA a second § 510(k) pre-market notification to announce its intention to sell its ILA anastomosis surgical stapling equipment. The SCI device was stated to be "substantially equivalent" to USSC's GIA surgical stapler, and SCI also stated that "[b]oth devices utilize the same type of disposable cartridges ... [which] utilize similar staples, similar anvils, similar staple line configurations, and the same tissue-joining methods." PX–538. Following the acknowledgement on February 12, 1982 of SCI's claim of equivalence, the defendants began to market its ILA devices in the United States.

■ In an infringement action, the patent owner must prove by a preponderance of the evidence that the accused devices fall within the scope of the asserted claims as properly interpreted. *E.g., Envirotech Corp. v. AL George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984). Thus, the the asserted claims must first be defined, and then compared with the accused devices to determine whether what is claimed has been made, used or sold by another. *Id.; Cabot*

*Corp.*, 845 F.2d at 986. USSC claims that the defendants are liable for direct and contributory infringement and inducement of infringement, for the sale, use, production, and distribution in the United States of the products listed below: [32]

### Disposable Loading Units

PI 30 Medium (formerly designated 30 Medium)

PI 30 Large (formerly designated 30 Large)

PI 55 Medium (formerly designated 55 Medium)

PI 55 Large (formerly designated 55 Large)

PI 90 Medium (formerly designated 90 Medium)

PI 90 Large (formerly designated 90 Large)

PI 90 OB (formerly designated 90 OB)

ILA (Anastomosis)

(formerly designated GA/ANAST)

ILA (Non–Anastomosis)

(formerly designated GA/NON ANAST)

### Instrument

ILA Instrument

### 1. *Direct Infringement* [33]

#### a. Hirsch '211

■ USSC has alleged that the defendants' PI DLUs directly infringe claim 4 of the Hirsch '211. Mr. Blackman has indicated that, in the event the Court were to find the Hirsch '211 valid and enforceable, infringement of claim 4 would be conceded. Nevertheless, the Court has compared the defendants' 55 medium DLU with claim 4 and USSC's TA 55 DLU, and after reviewing the relevant evidence hereby concludes that the plaintiff has met its burden of proving that the defendants' PI DLUs clearly fall within the scope of claim 4 as that claim is literally read, as well as the way that claim has been interpreted by the Court herein. *Compare* PX–1, claim 4 *with* PX 725; *see also* PX 685; 991; 8003.

#### b. O'Dea '863

USSC also has alleged that the defendants' PI DLUs directly infringe claim 1 of the '863, and that the defendants' ILA DLUs with defendants' ILA instrument directly infringes claim 15. As to claim 15, the defendants have not put forth a defense of noninfringement. The Court has reviewed the relevant testimony and evidence, including plaintiff's exhibits 4, 690, 693, and 726, and is satisfied that the plaintiff has presented evidence sufficient to sustain its claim of infringement of claim 15.

With only one exception, the scope of claim 1 is not in dispute. Claim 1 defines the pusher fingers as extending into the staple slots "and into abutting relation with the back end of each staple." The defendant contends that, in the absence of any evidence to the contrary, the normal definition of the term "abutting," i.e. "in contact with," should apply. Further, since there is no competent evidence that supports a finding that the fingers on the defendants' instruments are in contact with the staples, the Court cannot make a finding of infringement. The plaintiff concedes that the pusher fingers are not in physical con-

---

**32.** The relevant portions of the infringement statute provide:

(a) ... [W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271.

**33.** At trial, the defendants stipulated that infringement of a claim by any one of the TA type cartridges that the defendants sell applies to all such devices. So, for example, once the plaintiff establishes infringement of one claim by the defendants PI 30, then infringement of that claim is stipulated as to the remaining PI cartridges listed above.

tact with the PI staples in every instance. This point alone, however, cannot, in this case, sustain a defense of noninfringement.

First, the plaintiff has presented unrebutted evidence, and expert testimony that suggests that, because of difficulties and imprecision in mass manufacturing, it is impossible in all cases to produce the cartridges so that all staples touch all pusher fingers. Rather, it is likely that there exists a small distance between the two components; a distance that may vary from one to two thousandths of an inch. Such distances are acceptable, so long as the function set forth in claim 1—to assure that the pusher is inserted far enough to be aligned with the cartridge—is satisfied. The Court is of the view that one of ordinary skill in the art, after reference to the claim and specification, would understand the likelihood of the existence of such distances, and, further, that the term "abutting" would be understood to encompass those distances that are a product of the difficulties of manufacturing the components. *Cf. Shatterproof Glass Corp.*, 758 F.2d at 624 (claims must be read in light of the specification, reasonably apprise those skilled in the art of the utilization and scope of the invention, and be as precise as the subject matter permits); *Fromson*, 720 F.2d at 1571. Read in this light, the Court finds the defendants' PI DLUs to literally infringe claim 1.

Second, even though all the pushers and fingers in the defendants' PI DLUs do not contact, or literally abut one another, it is clear that the staples and cartridges perform substantially the same function and achieve substantially the same result as disclosed in the relevant elements of claim 1. The doctrine of equivalents prohibits patent duplication through subtle alteration of a noncritical aspect of a patent's teaching. In this case it is clear that it is of no functional significance that there may be a slight distance between the pusher and the staple. Thus, even were claim 1 not found to read literally upon the defendants' PI DLUs, they are found to directly infringe under the doctrine of equivalents. *See generally Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) ("[I]f two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.").

#### c. Green '533

The plaintiff alleges that the defendants have directly infringed claim 22 of the Green '533 by making, using, or selling within the United States their ILA anvils, together with the appropriate ILA DLU elements and the ILA instrument.[34] In his proposed findings, Blackman contends that either the defendants' products do not infringe, or that the plaintiff should be estopped from asserting claim 22 as amended.[35]

Blackman's argument that claim 22 is not literally infringed is premised upon a mischaracterization of the claim. Claim 22 is not limited to an anvil groove having parallel vertical walls or a parallel vertical drop, nor is it limited to an anvil groove having an unflared bottom. Rather, the claim refers to "the bottom unflared portion" of the anvil groove, and does not refer to a dividing line between the upper, flared portion, and the bottom, unflared portion. Claim 22 has been defined as encompassing anvil grooves that have a first, upper portion with a gradual slope, and a

---

**34.** Only the anvils manufactured after the resumption of production in April, 1981 are alleged to infringe claim 22 of the Green '533 patent. They are as follows:

| DLU | Infringing batches (including and after) |
|---|---|
| PI 30 Medium | 09101 |
| PI 30 Large | 08101 |
| PI 55 Medium | 07100 |
| PI 55 Large | 06100 |
| PI 90 Medium | 05101 |
| PI 90 Large | 04101 |
| PI 90 OB | 18101 |

**35.** Given the Court's conclusion that the defendants' anvil grooves literally infringe claim 22 of the '533, it is not necessary to reach the alternative defense raised by Blackman that is founded upon the doctrine of equivalents and the file wrapper estoppel doctrine. *See Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1571 (Fed.Cir.1983).

second, lower portion having a steeper slope.

The defendants' anvils were examined under varying degrees of magnification through the use of a magnifying glass, a conventional optical microscope and an electron microscope. The Court heard persuasive expert testimony regarding those examinations, and reviewed the photographs taken through the eyes of the microscopes. The Court also finds persuasive the evidence that demonstrates the extensive, and eventually successful efforts of the defendants to copy the USSC anvil disclosed in claim 22 of the '533. Thus, it is clear the defendants' anvil grooves, when used in an anvil groove with an appropriate cartridge, literally infringe claim 22 of the '533. *See, e.g.,* Plaintiff's exhibits 7; 726; 991; 8012.

### d. Green '591

Plaintiff alleges that claim 9 of the '591 is infringed by defendants' ILA DLUs, and that claim 15 is infringed by the ILA (Anastomosis) DLU with defendants' ILA instrument. As to claim 15, the defendants have offered little in the way of a defense. In fact, at trial, defense counsel stated that infringement of claim 15 was not seriously contested, even though in his view, the claim was not intelligible. Tr. at 2164.

It is the theory of the defense that, since the forces opposing defendants' staple ejection are not balanced around the pusher cam, and since the patent does not clearly distinguish around which axes the forces are balanced, the defendants' products do not infringe claim 9. The Court essentially disposed of this contention in the discussion of the enablement requirement as it pertains to claim 2 of the '591, upon which claim 9 is dependent. Briefly stated, the scope of claim 9 should be construed so that the forces around the pusher cam are not literally balanced, but tend toward a better, or relative balance about two axes, and a decrease of imbalance of moments in the third axis. In light of this conclusion, and after a review of the relevant evidence, particularly plaintiff's exhibits 10, 690, 693, 726 and 8012, as well as the testimony of Noiles, it is clear that the defendants' ILA

cartridges and instrument copy the '591, and experience the same balancing moments.

### 2. *Contributory and Induced Infringement*

The plaintiff also has brought a claim for contributory and induced infringement under 35 U.S.C. § 271(b) & (c) for the sale in this country of defendants' products for use in combination with the appropriate USSC instruments as follows:

O'Dea '863 claim 15   Defendants' PI and ILA DLUs
Green '591 claim 15   Defendants' ILA (Anastomosis) DLU
Green '533 claim 22   Defendants' ILA DLUs; PI DLUs

In order to state a claim under § 271(c), the plaintiff must establish:

(a) that the accused device that was sold constitutes a material part of the invention;

(b) that the defendant knew the device was especially made for, or adapted for use in infringing the patent;

(c) that the thing sold is not a staple article or commodity of commerce suitable for substantial noninfringing use; and

(d) direct infringement of the accused device.

*Hodosh v. Block Drug Co., Inc.,* 833 F.2d 1575, 1578 & n. 9 (Fed.Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988); *see also Aro Mfg. Co., Inc.,* 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) (in order to prevail upon contributory infringement claim, party must first establish direct infringement).

It cannot reasonably be disputed, and in fact is not, that, on this record, the plaintiff has sustained its burden of proving the elements to establish liability for contributory infringement. The plaintiff's devices cannot function without the anvils and cartridges disclosed in the above claims, and are not suitable for use as a staple article for noninfringing use. Blackman's own personal training in the use and marketing of USSC's devices, and the pattern of deception, subversion, and outright copying by the defendants, together with the scheme to market the hybrid cartridge

packages, can lead only to a finding of knowledge and intent. Finally, direct infringement of the subject claims already has been established.

Insofar as the plaintiff seeks to impose liability for inducement of infringement under 35 U.S.C. § 271(b), that claim must fail on the present record. Not only was section 271(b) not designed to subject to liability a party who actually infringes a patent, *see Honeywell, Inc. v. Metz Apparatewerke,* 509 F.2d 1137, 1141 (7th Cir.1975), but the plaintiff has failed in this regard to define for the Court its proposed theory of liability.

### 3. *Willful and Deliberate Conduct*

■ Upon a finding of willful and deliberate conduct, the Court "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. To determine whether the infringer acted in bad faith so as to warrant the increase in the damages awarded against him, the Court should consider the

> totality of the circumstances, including, (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and (3) the infringer's behavior as a party to the litigation.

*Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed.Cir.1986) (citations omitted).

Further, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. To prevail under this fee shifting provision, the plaintiff must prove bad faith by clear and convincing evidence. *Reactive Metals Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1582 (Fed.Cir.1985). In some cases, a finding of willful infringement alone, may be sufficient to support a finding that the case is "exceptional." *See Kori Corp. v. Wilco Marsh Buggies & Draglines,* 761 F.2d 649, 657 (Fed.Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985); *see also Kloster Speedsteel AB,* 793 F.2d at

1581–82 (element of willfulness may support finding that case is exceptional so as to warrant award of fees under § 285); *Pacific Furniture Mfg. v. Preview Furniture Corp.,* 626 F.Supp. 667, 679 (M.D.N.C. 1985) (same), *aff'd,* 800 F.2d 1111 (Fed.Cir. 1986).

From the repackaging of the sample accessories and the production and marketing of the hybrid packets, to the reverse engineering, and, ultimately, the outright copying of plaintiff's anvil groove design, there is overwhelming evidence in this record that the defendants deliberately and willfully infringed USSC's patents. Moreover, there is no admissible evidence to rebut the assertion that Blackman, who had notice of USSC's patent rights, had not sought and obtained timely and competent legal advice. *See Underwater Devices Inc. v. Morrison–Knudsen Co.,* 717 F.2d 1380, 1389–90 (Fed. Cir.1983) (a party that has actual notice of another's patent rights has an affirmative duty, *inter alia,* to seek and obtain competent legal advice from counsel before the initiation of any possible infringing activity). Blackman did attempt, unsuccessfully, to adduce at trial evidence to support his position that he had fulfilled his duty regarding legal advice, but that evidence had been suppressed during discovery, at Blackman's request, under the attorney-client privilege. At any rate, it is doubtful that Blackman could have mustered any persuasive evidence that he had acted in good faith with regard to the Green '533 anvil groove, particularly since his counsel conceded on the record that they were aware of no evidence that the defendants had copied the Green anvil groove design. *See Scott Paper Co. v. Moore Business Forms, Inc.,* 594 F.Supp. 1051, 1084 (D.Del. 1984) (Before an infringer can be found to have acted in good faith, "the infringer must supply all pertinent facts to counsel as a basis for a reliable opinion.").

Notwithstanding any assertions that the defendants acted in bad faith throughout the course of the litigation of this matter, there is ample support for a finding that the case is "exceptional," and that the defendants acted willfully and deliberately.

Upon an appropriate application during the hearing on damages, the Court will determine the proper enhancement of the award, and the appropriate attorneys fees.

### 4. *Personal Liability*

██ Personal liability may be imposed upon "corporate officers for participating in, inducing, and approving acts of patent infringement." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1578–79 (Fed.Cir.1986); *see also Thompson Tool Co., Inc. v. Rosenbaum*, 443 F.Supp. 559, 561 (D.Conn.1977); *accord Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 481 (Fed.Cir.1985) (one who aids and abets an infringement is likewise an infringer). The present record supports a finding that Blackman should be held liable not only for his own acts, but for the acts of the corporate defendants as well.

At the time of its incorporation on January 19, 1979, Blackman was the sole owner of HPI. The actual holder of all of HPI's stock was a company named Morust, which was completely owned by Blackman. Through HPI, Blackman also owned SCI, initially the wholly-owned subsidiary of HPI. The ownership of SCI by Blackman through HPI continued until June 30, 1981 —well after the importation of infringing goods into the United States had begun—at which time, HPL, a public company that Blackman served as Chairman, acquired all the assets and undertakings of both SCI and its parent, HPI. HPI owned slightly more than half of the shares of HPL stock. Thus, despite the acquisition, Blackman retained a substantial and controlling interest in both HPI and SCI. Blackman did not sell his interest in HPL until October, 1984, well after the commencement of the instant litigation.

Besides owning both HPI and SCI, Blackman served each as chief executive officer. Prior to the takeover by HPL in 1981, Blackman was the Managing Director of HPI. He served SCI as President and Chairman of the Board of Directors from as early as before the takeover by HPL until his resignation as a director and an officer in August and November, 1983, respectively.

By virtue of his activities as an officer, director and controlling shareholder of the corporate defendants, Blackman was the moving force behind the infringement. The fact that he initiated these activities in Australia is not a matter of happenstance, but was part of a deliberate scheme of chicanery. Blackman was aware at the time that USSC had not yet filed for patent protection in Australia, and he also knew of the difficulties USSC would have keeping tabs on an errant distributor so far from its own home base. He developed and laid the groundwork for his scheme even before he reached Australia, but once there, Blackman personally instituted the plan for producing imitation components, and developing and marketing the hybrid packets. Blackman was intimately involved with the copying of the USSC components, and even went so far as to submit a fraudulent and copied patent application in his own name.

It was Blackman who repeatedly held himself out as the one responsible for the "cartridge project," and the one who decided to compete with USSC in the sale of surgical stapling products. Moreover, it was Blackman who signed the "kick-off" letter announcing the availability of the infringing products in the United States, and it was Blackman who, as representative for the defendants, secured the necessary FDA approval. It also was Blackman who negotiated the distribution agreements with American Hospital Supply, and other distributors throughout the United States. Thus, the record is replete with evidence of Blackman's involvement—both as an individual, and as an officer and representative of the corporate defendants—in the copying of USSC's products, and the production, marketing, and distribution of the infringing products.

### CONCLUSION

For the foregoing reasons, the Court finds that the defendant has failed to prove the patents-in-suit either invalid or unenforceable, and the plaintiff has proven its claims of infringement. Accordingly, the

defendants' motion to dismiss is DENIED, and judgment shall enter for the plaintiff. The plaintiff shall submit an appropriate application for an accounting of damages in accordance with the original memorandum of decision as modified by the Court's ruling on plaintiff's motion for extension of time in which to file an application for accounting.

It is SO ORDERED.